UNITED STATES of America, Appellee,

v.

Miriam M. SHORT, Appellant.

No. 78–1283.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 8, 1979.

Decided April 30, 1979.

Rehearing and Rehearing En Banc
Denied June 25, 1979.

Jeffrey H. Pass of Stolar, Heitzmann & Eder, St. Louis, Mo., for appellant.

Georgia M. Goslee, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on the brief.

Before LAY, BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

Miriam M. Short was convicted upon a plea of guilty to one count of devising a scheme to defraud the Department of Public Health and Welfare of the State of Missouri by means of fraudulent misrepresentations, in violation of 18 U.S.C. § 1341.[1]

---

1. This is not a case where the defendant merely neglected to notify the authorities that she had gone back to work. The facts of the *crime* are set forth in the probation report as follows:

OFFICIAL VERSION OF OFFENSE

On August 16, 1972, Miriam M. Short initially applied for Aid to Dependent Children. Subsequently, on September 5, 1972, she was employed by the Human Development Corporation. Her application was validated by the Welfare worker on September 20, 1972, but at that time defendant failed to indicate employment. On approximately nine separate occasions, between October, 1972, and April, 1976, defendant reapplied for Aid to Dependent Children and food stamps and her case was reviewed by the Welfare worker.

On each of the occasions, defendant did not show any employment, although she was employed throughout this period. *On September 17, 1975, during her regular review, Short signed a form acknowledging that it was against the law not to report any change of family income or circumstances.* In September, 1976, Short reported other income to the Welfare Office, signed a notification of the Fraud Provisions, and her ADC case was closed at her own request.

Between November, 1972, and October, 1976, defendant received $9,751.00 in Aid to Dependent Children, $8,026.00 in food stamps and $724.10 in Medicaid. Although she was not entitled to any of these benefits, the Medicaid amount was not included in the Indict-

Seven other counts were dismissed pursuant to a plea bargain. She was sentenced to imprisonment for a period of three years. She now appeals from the district court's denial of her motion to reduce sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. We affirm.

Short pleaded before the district court for a lenient sentence, citing *inter alia* the following factors:

a) she was a first offender;

b) she was supporting four of her children, the youngest of whom was ten years old;

c) she was truly remorseful and offered to make restitution;

d) as a result of the criminal proceeding, one of her children had become ill with a peptic ulcer and needed her presence; and

e) she had been induced to commit the crime by a combination of financial and emotional pressures occurring simultaneously.

The district court rejected Short's plea for a more lenient sentence, allegedly in large part on the basis of information that, after her conviction, Short submitted a false college transcript to the probation officer in connection with her presentence

investigation.[2] She also told the court at her first arraignment: "I graduated, I have a degree in social work." Short alleges that her sentence was based largely on this one negative factor, and that the district court did not properly consider the circumstances favorable to a more lenient sentence.[3]

We have reviewed the transcripts of the sentencing proceeding and the proceedings on the motion to reduce sentence and conclude that the district court weighed *all* factors presented to it, including those supporting a lenient sentence and Short's explanation for submitting the forged transcript. In the exercise of its discretion, the court made a decision unfavorable to Short. We will not disturb that exercise of discretion on appeal.[4]

The information that Short presented a forged college transcript to the probation officer is clearly within the proper realm of inquiry in a sentencing proceeding. *See United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Orner v. United States,* 578 F.2d 1276, 1278–79 (8th Cir. 1978); *United States v. Durbin,* 542 F.2d 486, 489 (8th Cir. 1976); 18 U.S.C. § 3577. Furthermore, Short does not allege that the infor-

ment, making a total of $17,777.00 received fraudulently by the defendant in ADC and food stamp payments. (Emphasis supplied.) Not only did she continue to *misrepresent* her employment status, knowing it to be a violation of the law, she drew over $17,000.00 in ADC and food stamps during the almost four years her fraudulent representations continued. The defendant did not deny these facts and the record does not indicate that any of this sum has been repaid. During part of the time the fraud continued and thereafter she lived in a $450.00 a month townhouse.

2. The dissent, in holding that the trial court abused its discretion, states as follows:

In sum, the record indicates that the false college transcript incident played a decisive role in the district judge's sentencing decision opting for incarceration rather than probation. Because of his focus on that incident, the judge failed to give due consideration to far more compelling circumstances in the record revealing Ms. Short's excellent rehabilitative prospects.

This statement infers incorrectly that the district judge abandoned his duty to sentence for the crimes committed but sentenced rather for

incidents unrelated thereto. I do not agree with either the dissent or the concurring opinion in this regard.

3. In addition to the false transcript the probation report reflects that defendant was charged in 1962 with stealing under $50.00 and paid a fine of $20.00 plus costs. The defendant claimed to have no memory of this transaction but did not deny it. Other incidents described in the probation reports concerning the use of a gun, an insufficient fund check and assault were denied by the defendant and there is no indication that the trial judge considered them in determining the sentence. He affirmatively indicated he did not consider the alleged shooting incident.

4. If the dissent should become the majority opinion of this court, the number of appeals to this court alleging abuse of discretion in the sentencing process would increase dramatically. In my opinion a majority of this court is not willing to second guess the district judges on sentencing matters to the degree advocated by either the dissent or the concurring opinion.

mation was false, or that she was not given an opportunity to explain the reason she submitted the transcript. In sum, she has made no "clear and convincing case of abuse of discretion on the part of the sentencing judge." *Orner v. United States, supra,* 578 F.2d at 1280.

Short also contends that the sentence was grossly excessive and manifestly disproportionate to the crime and the character of the criminal. To support her contention, she cites four other welfare fraud cases decided in a 27 month period in the Eastern District of Missouri. In those four cases, the sentences imposed were more lenient.

Short's contention is without merit. Her three year sentence is well within the five year maximum. The sentences imposed in four other cases for different offenses and with respect to different offenders have no relevance on the facts of this case to Short's sentence. *Cf. Woosley v. United States,* 478 F.2d 139, 146–48 (8th Cir. 1973) (review of a maximum sentence so irrationally disproportionate to typical sentences for the offense as to shock the judicial conscience.)

Finally, Short argues that the sentence was impermissibly based in part on a letter written by a Mr. Williams of the Coalition of Black Trade Unionists; the letter was critical of the probation office. We disagree. The district judge made it clear in commenting on the letter, that while in his opinion it was not the function of Mr. Williams to interfere with the operation of the probation office, the court's decision was not based upon a negative reaction to the letter. We are convinced that the sentence was not affected by improper consideration of Williams' letter.

Judgment affirmed.

LAY, Circuit Judge, concurring.

I concur in the judgment affirming the conviction. I do so because I believe under the present status of the law this court has only a very limited power to review the sentence of a district court in a criminal case. I must respectfully disagree with the district court's sentence, primarily for the reasons set forth in the dissent since I feel under all the facts and existing circumstances that the administration of criminal justice would be better served by placing the defendant on probation. Nonetheless I feel the sentence was within the discretion of the district court; that the district court exercised judgmental discretion in making an individualized sentence. Once this determination is made I sincerely question whether this court has authority to set aside the sentence made and substitute its own judgment.

Nonetheless, in view of the undue emphasis the district court placed upon the alleged use of the false transcript with the probation office,[1] I encourage counsel to return to the district court under Fed.Crim.Rule 35 and once again seek review of the sentence.

It is difficult for me to impute bad motive to the defendant in furnishing the transcript to the probation officer. She was requested to furnish the officer with the documents she had used in obtaining employment. She did so and should not be faulted for complying with the request. Even assuming that it may be stated that she falsely misrepresented her school experience to the probation officer, I have further difficulty in understanding what "net gain" she might obtain by doing so. Evidently the trial court felt that in furnishing the false transcript she was not fully repentant and would return to her fraudulent ways. I suggest that there is such a remote connection, particularly where the factual record shows that the transcript was forged several years previously, that it should have

[1]. At the Rule 35 proceeding in the district court the trial judge stated:

> I'll tell you very frankly, ma'am, one of the reasons why the sentence was even as rough as it was, if it is rough, was that the information contained concerning the transcript . .
>
> . . . . .
>
> Like I say, if the Court had been so advised at that time, the results would have been considerably different.

little or no bearing on the sentence given. The fact remains that Mrs. Short voluntarily turned herself in to the authorities and if given the opportunity has offered to make restitution. Certainly our prisons should be the place of last resort to confine incorrigibles and law breakers. Supervised probation holds a better chance for rehabilitating a working penitent mother than a caged cell. Hopefully, defendant will return to the district court and in review of all the factors involved the court will reconsider the sentence made.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent.

The exercise of sentencing discretion to grant or to deny probation "implies conscientious judgment, not arbitrary action." *Burns v. United States,* 287 U.S. 216, 222–23, 53 S.Ct. 154, 156, 77 L.Ed. 266 (1932). In sentencing Miriam Short to three years' imprisonment, the district court appears to have given primary consideration to matters having little to do with the advisability of probation in the circumstances of this case.

Upon examining the complete record, I am convinced that the district court made a serious mistake, amounting to an abuse of discretion, in sentencing Ms. Short to a three-year term of incarceration. Accordingly, I would vacate the sentence and remand for reconsideration in accordance with the principles expressed herein.

I. *Background.*

In August 1972, Miriam Short, then unemployed and the sole support of her five children,[1] applied for Aid to Dependent Children (ADC) benefits at an office of the Missouri Department of Public Health and Welfare (DPHW). Thereafter, in September 1972, Ms. Short was employed by the Human Development Corporation. She failed to report this employment to the DPHW and, as a result, received a substantial amount of welfare benefits to which she was not entitled.

In September 1976, on her own initiative, Ms. Short reported her employment to the DPHW, admitted that she had wrongfully received benefits, and requested that her ADC case be closed. This voluntary disclosure by Ms. Short led to the instant prosecution, in which she pled guilty to using the mails in furtherance of a scheme to obtain money by false representations, in violation of 18 U.S.C. § 1341 (1976).

Ms. Short requested that the district court grant her probation and, in support of that request, presented the court with pertinent information, showing:

1) She had no prior felony convictions;

2) She was willing and offered to make restitution;

3) She was supporting four of her five children, the youngest being age ten; and

4) Except for the present charge, she had been a good citizen, a productive employee, and a good parent to her children.

In addition, numerous friends and associates of Ms. Short submitted letters to the district court attesting to Ms. Short's qualities as a parent who maintains an excellent family home environment, to her active involvement in community, church and school affairs, and to her capable, honest, and efficient service as an employee.[2] Other let-

---

1. Ms. Short separated from her second husband, Charles Short, the father of her two younger sons, in early 1972. They were divorced in November 1972, and Ms. Short was awarded custody of the children. Because of injuries sustained in a December 1972 automobile accident, Charles Short apparently made no child support payments for some two years after the divorce. Ms. Short received no assistance from her first husband, Mathis Gray, the father of the three oldest children, after their divorce in 1964.

2. For example, a letter from Alfred E. Lucas, Area Director for the U.S. Consumer Product Safety Commission, reads in part:

   I have known Ms. Miriom [sic] Short since approximately 1967; at which time she came to work at an agency which I was the Director of approximately 21 programs. Because of her interests, her concern for people, and her ability, she quickly came to my attention. Because of her ability, her dedication and willingness to work long hours, Miriom advanced quickly in the agency. At the

ters, submitted by school personnel and others, attested to Ms. Short's interest in her children's activities and to the children's good behavior and achievement, as evidencing Ms. Short's excellence as a parent.[3]

The Eastern District of Missouri Probation Office conducted a presentence investigation which, in a report dated April 12, 1978, generally confirmed Ms. Short's close family life and her history of stable and responsible employment. During the course of this presentence investigation, however, Ms. Short presented to the probation officer a college transcript showing the completion of 143 quarter hours at Southern Illinois University. This transcript, which Ms. Short apparently had obtained several years previously as an aid in seeking employment, had been falsified.

At the sentencing proceeding on April 13, 1978, the district court focused almost exclusively on the incident of the false college transcript. The following colloquy occurred at that sentencing hearing:

THE COURT: Let me ask this, get right down to the essentials of the situation: I assume from what you've said that there is no question but that the so-called transcript was a forgery, is that correct?

MR. PASS [Attorney for Defendant]: That's correct.

THE COURT: Is there any question that she presented it to the probation office subsequent to her plea and in connection with her pre-sentence investigation?

MR. PASS: No, but what I'm trying to say, that she wasn't consciously presenting that to the probation office to convince them of anything. This is something that she had done before. In her mind probably she was excepting [sic] this as truth at this point. She wasn't necessarily saying to the probation office: I'm trying to convince you of this. The wrong that was done with that transcript had been done before. We're not trying to say it wasn't wrong, but it had been done before.

THE COURT: Well, of course, the problem the Court has now, what happened to this transcript has nothing to do with the plea, but its presentation to the pre-sentence investigation people is a matter that gives the Court considerable concern, particularly in view of her indication that she was sorry and didn't want to do it again. Is there anything further?

MR. PASS: I have nothing further.

At the conclusion of this exchange, without further comment, the district court sentenced Ms. Short to three years' imprisonment.

Following the imposition of sentence, Ms. Short appealed, contending that, under the circumstances, the sentence was unduly severe and that the district court had improperly based the sentence on her use of a false college transcript. Thereafter, she asked this court to stay the appeal to allow the district court an opportunity to consider reducing the sentence under Fed.R.Crim.P. 35. On May 4, 1978, we granted that request for a stay of the appeal and partially remanded the case to the district court.

---

time that I left the agency, she had advanced all the way to the Director of an Employment Training Program * * *.
* * * During my association with [Ms. Short], I have found her to be personable, intelligent, outgoing, giving and her character has *ALWAYS* been beyond reproach. [Emphasis in original.]

3. Phillip M. Greer, principal of Caroline School in Berkeley, Missouri, which Ms. Short's two younger sons had attended, wrote one such letter, dated March 23, 1978, which reads in part:

Mrs. Short was very supportive of our educational program.

The children [Jay and Charles Short] were polite, well mannered and well dressed. They provided their own lunches and attendance was excellent.
Both children made good progress in school. It was quite obvious to me and the faculty here that Mrs. Short cared very much for her family and wanted the best for them. Mrs. Short was constantly in contact with me and the children's teachers, to see that they got a good education.

The record also discloses that Ms. Short's three older children are college students, two at the University of Missouri, and the third attending a community college while working.

Ms. Short subsequently filed a Rule 35 motion to reduce sentence in the district court.

The district court held two hearings on Ms. Short's motion. At the first motion-hearing, on June 2, 1978, Ms. Short advised the court that one of her sons had become ill and that she had obtained new employment.[4] The court directed that a decision on the Rule 35 motion be deferred for a week and, noting that "[t]he file contains [a] substantial amount of letters from various people," requested the probation office to reinvestigate Ms. Short's background.

The court confirmed at the June 2 hearing that the false college transcript had affected its sentencing decision, stating:

> I'll tell you very frankly, ma'am, one of the reasons why the sentence was even as rough as it was, if it is rough, was that the information contained concerning the transcript that—

Ms. Short then sought to explain the circumstances in which she submitted the false transcript to the probation office, and the following colloquy ensued:

> [MS. SHORT] Okay, at the time that we were going through the pre-sentence investigation, * * * [the probation officer] wanted me to present to her all documents that I had used; she wanted information regarding all of my schooling, * * * so when I presented [the Transcript] to her I presented [it] to her in terms of these are the things that I have been doing, this is all the documents that I have been using. I was not to hold

back anything, so I presented this document to her.

> THE COURT: Of course, if you'd have told her at the time that that transcript was not a proper transcript—

> DEFENDANT: I talked to [the probation officer] in terms of I had tried to get employment and I had been told that I had enough credit hours for a degree by Dr. Mahannovich at St. Louis University, and Cervantes, Fr. Cervantes, and I had—you know, this is like ten years ago and I had really thrown it out of my mind, that the transcript wasn't legal.

> THE COURT: Like I say, if the Court had been so advised at that time, the results would have been considerably different. And I can understand perhaps what you're saying.

> The matter will be passed for a week pending further investigation.

The probation office's supplementary report, dated June 7, 1978, added nothing of significance in assessing Ms. Short's suitability as a candidate for probation and failed to address the issue of the false college transcript.[5]

At the second hearing on the motion to reduce sentence, on June 9, 1978, in marked contrast to his apparently sympathetic attitude toward Ms. Short at the June 2 hearing, the district judge indicated concern only for one matter: a letter written by Mr. Bob Williams, vice president of the Coalition of Black Trade Unionists, suggesting that, in the interests of objectivity, a probation officer other than the one initially as-

---

4. Because of these criminal proceedings, Ms. Short lost her previous job, which she had held for three and one-half years, as a rehabilitation counselor. *See* note 8 *infra*.

5. The supplementary report addresses three matters: (1) the illness of Ms. Short's 18-year-old son, Mark Gray, from "suspected peptic ulcer disease[,]" which was "quite likely * * precipitated by" Ms. Short's legal difficulty; (2) confirmation that Ms. Short's ex-husband, Charles Short, is willing to assume custody of the two younger children if Ms. Short is imprisoned; and (3) a 1973 arrest of Ms. Short, who was thereafter released without being charged, on an allegation that she shot a man. At the June 9, 1978 hearing, the district court concluded that this alleged shooting incident was com-

pletely unproven and would not be considered in sentencing Ms. Short.

The tone of this supplementary report is justificatory of the original sentence. For example, concerning the illness of Mark Gray, the report states that "[i]n [Ms. Short's] absence [Mark] would still have the emotional support of four siblings," and, further, "Dr. Newmark [Mark's doctor] would not say that Short's presence would speed [Mark's] recovery." In contrast, a letter from Dr. Newmark, dated May 20, 1978, and attached to the supplementary report, reads in part:

> I am quite certain that from a medical point of view [Mark] will be definitely more difficult to manage in the absence of his mother.

signed to Ms. Short's case should be asked to prepare the supplementary sentencing report.[6] The initial probation officer had in fact prepared the supplementary report, and the district court took umbrage at Mr. Williams' suggestion of bias.

The district judge sharply questioned both Ms. Short and her counsel as to their knowledge of Mr. Williams' letter. Both denied possessing any knowledge of the letter until after it had been written.

The district judge then said, regarding the letter:

Well now, the Court's going to give this matter due consideration, but let the record show that this Court will not tolerate—and I'm not talking about you, ma'am, but I am talking about Mr. Williams. He's advised at this time that he doesn't run the Probation Office, and as far as I'm concerned Mr. MacDoniels [J. Alan McDoniel, Chief Probation Officer, E.D. Missouri] runs it, he's charged with that responsibility, which is a heavy responsibility, but the Court takes a dim view of anybody casting aspersions on this Probation Office, and I want the record to so show.

Now, I am also going to attach this letter to the voluminous correspondence received by the Probation Office.

Without additional comment on the merits of Ms. Short's case, the district judge announced from the bench:

[T]he request for reduction of sentence is denied.

---

**6.** That letter, dated June 6, 1978, is addressed to "Director, Federal Probation and Parole," with a copy to the district court. The text of the letter reads:

On June 2, 1978, before Judge H. Kenneth Wangelin, Ms. Miriam Short was given a hearing. Doing [sic] the hearing Judge Wangelin ordered another background study of Ms. Short.

However, the person assigned to do the new study was the same one who did the initial study, Ms. Pat Pickett. Ms. Pickett might take the request by the Judge personally. If that becomes the case, she cannot objectively re-evluate [sic] Ms. Short.

## II. *Discussion.*

A federal district judge is vested with a large measure of discretion in sentencing, and his exercise of that discretion will not lightly be set aside. However, the sentencing judge's discretion is not unbridled. *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973) (*en banc*). In particular, this court may review a trial judge's refusal to grant probation. *Ibid.* at 146.

In determining whether or not to grant probation in a particular case, a district judge ought to exercise his discretion in accordance with established standards and objectives of sentencing. The Supreme Court in *Burns v. United States*, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932), discussed the dimensions of appropriate judicial discretion relating to probation, as follows:

The question is simply whether there has been an abuse of discretion and is to be determined in accordance with familiar principles; governing the exercise of judicial discretion. That exercise implies conscientious judgment, not arbitrary action. * * * It takes account of the law and the particular circumstances of the case and "is directed by the reason and conscience of the judge to a just result." * * * While probation is a matter of grace, the probationer is entitled to fair treatment, and is not to be made the victim of whim or caprice. [*Burns, supra*, 287 U.S. at 222–23, 53 S.Ct. at 156.]

The American Bar Association has adopted a set of "Standards Relating to Probation" (ABA probation standards)[7] which re-

We know that your office would not hesitate to see that objectivity is upheld. Therefore, we strongly feel that your office will give this matter its do [sic] consideration. Mr. Williams had previously written another letter, dated May 31, 1978, asking the district court to reconsider Ms. Short's sentence because of the hardship her imprisonment would inflict upon her family.

**7.** The American Bar Association Project on Standards for Criminal Justice, Standards Relating to Probation, Approved Draft, 1970.

state accepted sentencing principles applicable in all courts:

1.2 Desirability of probation.

Probation is a desirable disposition in appropriate cases because:

(i) it maximizes the liberty of the individual while at the same time vindicating the authority of the law and effectively protecting the public from further violations of law;

(ii) it affirmatively promotes the rehabilitation of the offender by continuing normal community contacts;

(iii) it avoids the negative and frequently stultifying effects of confinement which often severely and unnecessarily complicate the reintegration of the offender into the community;

(iv) it greatly reduces the financial costs to the public treasury of an effective correctional system;

(v) it minimizes the impact of the conviction upon innocent dependents of the offender.

[ABA Standards Relating to Probation at 27.]

1.3 Criteria for granting probation.

(a) The probation decision should not turn upon generalizations about types of offenses or the existence of a prior criminal record, but should be rooted in the facts and circumstances of each case. The court should consider the nature and circumstances of the crime, the history and character of the offender, and available institutional and community resources. *Probation should be the sentence unless the sentencing court finds that:*

(i) confinement is necessary to protect the public from further criminal activity by the offender; or

(ii) the offender is in need of correctional treatment which can most effectively be provided if he is confined; or

(iii) it would unduly depreciate the seriousness of the offense if a sentence of probation were imposed.

(b) Whether the defendant pleads guilty, pleads not guilty or intends to appeal is not relevant to the issue of whether probation is an appropriate sentence.

[ABA Standards Relating to Probation at 30 (emphasis added).]

The commentary to the above section 1.3(a) states that the three reasons given for refusing to grant probation "exhaust the legitimate bases for imposing a sentence to confinement." *Ibid.* at 31.

Under these standards, Ms. Short was clearly a proper candidate for probation. First, she voluntarily reported her defalcations to the authorities, who were previously unaware of any wrongdoing, and she offered to repay the money she had unlawfully received. Thus, confinement is not necessary to protect the public.

Second, the record is bare of any indication that Ms. Short is in need of correctional treatment which may be facilitated by confinement.

Third, Ms. Short defrauded the federal treasury, but she has already suffered from her conviction in her loss of employment and of her status as a respected member of the community.[8] If she were, in addition, required to go to work and repay the Government for its loss, such disposition, as a condition of probation, would not unduly depreciate the seriousness of her offense. Indeed, incarcerating Ms. Short instead of requiring restitution payments makes little sense as a practical matter, for such a disposition will inflict further losses on the public treasury. The Government must bear the substantial cost of any incarceration,[9] and

---

8. From July 1974 to March 1978, Ms. Short was employed as a rehabilitation counselor at the Division of Vocational Rehabilitation in East St. Louis. She was suspended and subsequently resigned from that position because of her conviction in the instant case.

9. A court may take judicial notice of the expense of incarceration in federal correctional institutions. The cost of housing female prisoners at two federal prisons for women, the Federal Correctional Institutions at Alderson, West Virginia, and Pleasanton, California, during fiscal 1978, amounted to $32.62 and $38.61 per person per day, respectively (approximate-

the welfare authorities may well be required to pay monies for the care of some of Ms. Short's children, who would be deprived of parental supervision and support.

A close reading of the record demonstrates that, at the original sentencing hearing, the district judge, instead of focusing on the above criteria relating to the advisability of probation, gave primary consideration to the false college transcript incident. Perhaps the district judge assumed that Ms. Short had demonstrated a continuing propensity to criminal conduct by presenting the false transcript to the probation officer. In any event, in sentencing Ms. Short, the trial court made no comment about the many other favorable aspects of Ms. Short's record indicating that she is a prime candidate for probation.

The use of a false transcript cannot be condoned. However, such conduct is not ordinarily deemed criminal or a ground for incarceration. Although the use of a false transcript in seeking employment may in many instances mislead a prospective employer in evaluating the qualifications of a job applicant, the record here establishes that Ms. Short defrauded no one in her work. As previously noted, former employment supervisors of Ms. Short gave her high praise both for motivation and for competence. Ms. Short's past misrepresentation of her educational credentials reflects adversely upon her,[10] but, in context, such conduct does not vitiate the other clear indications in the record of her rehabilitative potential.

At the first Rule 35 hearing on June 2, 1978, Ms. Short explained, apparently to the district judge's satisfaction, that in presenting the false transcript to the probation officer she did not intend to mislead. Rather, Ms. Short sought merely to comply with the probation officer's request that she furnish all materials she previously had utilized in seeking a job. The record is void of any indication that Ms. Short intended to use the transcript wrongfully in the future, and according to my understanding of the record, the district judge indicated at that June 2 hearing that, had he possessed Ms. Short's explanation of the transcript incident, "the results would have been considerably different."

At the final Rule 35 hearing, on June 9, 1978, the district judge's comments focused upon the Williams letter suggesting that a probation officer different than the officer previously assigned to the case continue with the investigation. The sentencing judge strongly objected to that letter and, without giving any reason for his apparent change of attitude from the preceding hearing on June 2, 1978, denied a reduction in sentence. Such a change of mind in a few days seems inexplicable unless reference is made to the judge's extremely critical remarks about the Williams letter.

In sum, the record indicates that the false college transcript incident played a decisive role in the district judge's sentencing decision opting for incarceration rather than probation. Because of his focus on that incident, the judge failed to give due consideration to far more compelling circumstances in the record revealing Ms. Short's excellent rehabilitative prospects.

In my judgment, the sentence of imprisonment for the reasons set forth by the court at the various sentencing hearings represents a mistake in the sentencing process reaching the level of a gross abuse of discretion. Accordingly I would reverse and remand with directions to the district court to correct the sentence, which I believe was erroneously imposed.

ly $12,000 to $13,000 per year). [Letter from Norman A. Carlson, Director, Bureau of Prisons, U.S. Department of Justice, November 2, 1978.]

**10.** Educational credentials carry a high premium in the search for employment, regardless of the experience and ability of the applicant, and it is a matter of common knowledge that some people have falsified such credentials in order to get a better job. Time magazine observed about this subject:

> Once upon a time, people lied about lineage; in today's meritocracy they lie about education. [*Time*, Feb. 5, 1979 at 125.]