OPINION OF THE COURT
Analisa Torres, J.
Defendant, Michael Weitz, moves, pursuant to CPL 410.90 (1), for an order granting early termination of his 10-year sentence of probation, on the ground that he is rehabilitated.
I held a hearing on May 10, 2012. Rabbi Efraim Salzman testified on defendant’s behalf, as did defendant. Although I find Rabbi Salzman to be a credible witness, I reject his conclusion that defendant’s practice of Orthodox Judaism nearly eliminates the risk that defendant will commit future sexual assaults and obviates the need for ongoing monitoring of defendant by the Department of Probation. I credit only portions of defendant’s testimony.
A motion to terminate probation is usually referred to the sentencing court. Due to Judge Michael R. Ambrecht’s retirement in 2009, the matter was randomly reassigned. I now undertake the difficult task of determining whether defendant is rehabilitated and whether continued supervision is warranted. In order to make that assessment, I must consider defendant’s current “conduct and condition” (CPL 410.90 [3] [a]) as compared to his status in 2004, when Judge Ambrecht approved the underlying guilty plea and imposed the sentence of probation. Accordingly, I have examined the information available to the sentencing court eight years ago (gleaned from transcripts and other court records), along with the evidence presented at the hearing of this motion. Following are my findings of fact and conclusions of law.
Facts
Background
Defendant is a 1987 graduate of NYU Law School. After working at the Skadden Arps law firm, he clerked for Southern *447 District Court Judge Robert E Patterson, Jr. Defendant went on to serve as a law professor at NYU’s business school. Since 1994, he has worked in the areas of marketing and public relations.
On February 19, 2002, a Sullivan County grand jury handed down an indictment charging defendant with attempted rape in the first degree, sexual abuse in the first degree and unlawful imprisonment in the first degree, arising from an incident in Loch Sheldrake, New York.
In a supporting deposition dated December 6, 2001, the 26-year-old female complainant avers that on the prior night she and defendant were out drinking, first at Johnny’s Bar and then at Bum and Kel’s, where defendant bought her “a lot of shots.” Shortly after midnight, he offered to drive her home. While in the car, defendant said he was expecting a call and needed to stop at his apartment. Once there, the complainant drank more alcohol and snorted cocaine. She repeatedly asked defendant to take her home, but he insisted on waiting for the call, which never came. At about 4:00 a.m., defendant took off all his clothes. The complainant attempted to leave, but he grabbed her hand and pulled it to his penis, saying, “Just make me come and I’ll take you home.” The two wrestled, defendant threw the woman on the bed, got on top of her and attempted to pull off her pants. She yelled, managed to break free and tried to open the door, which defendant slammed. He swung a fist at her, but struck the door. Defendant twice threw the complainant on the couch, but she ran out of the apartment and sought the assistance of building security.
That day, according to a New York State Police report, Officer Ellen K. Haberzettl interviewed three of defendant’s neighbors. Reuben and Shirley Levine reported that at about 5:00 a.m. they heard 15 minutes of yelling and banging coming from another apartment, which sounded like a man and woman arguing. Ronald D. Resch commented that he had known defendant for between two and three years and that on a dozen occasions he heard women in defendant’s apartment screaming “let me up,” “get off me” and “let me go.” The noise caused Resch to sleep with earplugs. Resch also stated that he had overheard defendant offer women money for sex.
On July 25, 2002, Sullivan County Probation Officer Linda Lukoff submitted to the court a presentence report based, in part, on a June 22, 2002 psychiatric report by David L. Frank, M.D. Dr. Frank, who started treating defendant in 1988, stated *448 that although defendant “ ‘has many attributes and areas of high functioning, including the capacity for emotional growth, . . . [he] has demonstrated difficulties in major areas of mental functioning, including anxiety, anger control, rejection sensitivity, self-defeating behavior, obsessive symptoms, and problematic judgment . . . ” With respect to defendant’s family history, Lukoff reports that
“Frank described the Weitz household as one characterized by frequent fighting and yelling, a tone, which was set by both parents. Weitz has vivid memories of loudness and fighting. The father had temper problems and the mother was described . . . as often overly protective and having significant anxiety problems herself.”
Defendant stated to Lukoff, “I live a very high lifestyle . . . [enjoy the] ‘fine arts’ . . . [and partake in] ‘only very expensive red wines, usually costing $100.00 per bottle’ . . . .” Defendant admitted to drinking “about four beers” on the night of the incident, but denied wrongdoing. He stated, “Nothing of what [the complainant] said happened . . . she was drunk and using cocaine and was mad that I wouldn’t drive her home.” Under the heading “Evaluative Analysis,” Lukoff wrote, “Weitz does not admit to the offense and places responsibility on his victim . . . .”
On August 5, 2002, in Sullivan County Court, defendant pleaded guilty to two crimes: sexual abuse in the second degree (subjecting another individual to sexual contact when that person is incapable of consent by reason of some factor other than being less than 17 years old, under Penal Law § 130.60 [1]) and unlawful imprisonment in the second degree (Penal Law § 135.05). He was sentenced to concurrent terms of probation; six years for the sex abuse count and three years for the unlawful imprisonment charge. Under the Sex Offender Registration Act, also known as Megan’s Law, defendant was adjudicated a level one sex offender.
Less than two years after defendant’s upstate convictions, on September 22, 2003, he committed a sexual assault in Manhattan. Defendant was arraigned on the charge of rape in the first degree. But, the parties reached a court-approved plea agreement and, on July 28, 2004, in Supreme Court, New York County, defendant waived indictment and agreed to be prosecuted by a superior court information alleging the lower charge of attempted sexual abuse in the first degree (subjecting an *449 other individual to sexual contact when that person is incapable of consent by reason of being physically helpless, under Penal Law §§ 110.00, 130.65 [2]). Defendant pleaded guilty to that charge, admitting that when he attempted to touch the vaginal area of his female victim she was physically helpless and, therefore, incapable of consent. Judge Ambrecht promised a . sentence of six months’ incarceration to be followed by a 10-year term of probation.
At the May 10, 2012 hearing of this motion, Assistant District Attorney (ADA) Jessica Lynn recounted the facts and circumstances that led to the plea agreement. In 2003, ADA Lynn interviewed a female complainant in her twenties who stated that she had been looking to get into the field of public relations and considered defendant a mentor. On the night of September 22, 2003, defendant took the young woman to a work-related event where
“he gave her a couple of drinks, and she started to feel very differently than she had ever felt having drunk — even having more alcohol to drink than she did that night. Her . . . memory became very spotty, sort of start, stop. The way she described it was more like flashes from the movie without the full movie, bits and pieces. And she ended up in a hotel room with Mr. Weitz. She has no memory of how they got there or — not full memory. And these flashes of memory are him and his body on top of her, holding her down, forcibly penetrating her with her coming in and out of these flashes. She has memories of her saying no. She comes to at some point, she starts screaming. A friend of hers had been called, at some point was outside. The friend comes in, sees the victim not completely dressed, hysterical, screaming. Mr. Weitz grabs his bags and runs out and disappears. The victim has bruises and scratches all over her body that she did not have earlier. . . .
“And as we continue to investigate, we find two other complaints by two other women, also young women in their early 20s . . . [w]ho describe similar, but not exactly the same situations with Mr. Weitz. Neither of those other two women had an ongoing either friendship or professional relationship with him. . . .
“The second woman met the defendant. He picked *450 her up. He brought her to a bar. She was looking for a job. And she said she had one drink with him. It was the middle of the day. All of a sudden her memory started fading. She felt real dizzy. She felt very much unlike herself. And in and out. And, again, a similar description to the first woman in terms of how she felt after having had, in her case, one drink. And at that point she doesn’t know what happened. And doesn’t know where she ended up. She thinks she may not have been sexually abused by defendant. . . .
“The third woman again met the defendant, was looking for a job, had two or three drinks with him. Ended up she doesn’t know where. And found herself in a taxi. She feels she has no memory of a lot of what happened after defendant gave her a drink. She says to the taxi guy and to two patrol cops that are driving, I think I just got raped. I think I just got raped. She doesn’t know why she is saying that. She ended up at home, her underwear is inside out. She ended up at the hospital.”
ADA Lynn explained that the District Attorney’s Office suspected that defendant had used a “date rape” drug on the women, but that those substances “move through the system very quickly,” that there “was no forensic evidence as to any of the three” and that “[t]hese are very tough cases to prove.”
Although all three women testified in the grand jury, the grand jurors did not vote on the charges. The prosecution did not request a vote, because the parties had reached a settlement. The written agreement, prepared by defense counsel, states that defendant’s plea to one count of attempted sexual abuse in the first degree “will cover the allegations made by the three complaining witnesses . . . .”
As a consequence of defendant’s New York County conviction, on July 29, 2004, the Sullivan County Department of Probation filed a declaration of delinquency. On September 14, 2004, defendant pleaded guilty to a violation of probation. Judge Frank LaBuda revoked the previously imposed sentences of probation, sentenced defendant to six months’ incarceration and ordered him to pay a $1,000 fine.
The New York City Department of Probation presentence report prepared by Supervising Officer Chris Costello and dated September 23, 2004 states that defendant “admitted the charge” and recounted this version of the incident: “He had *451 known the complainant for about 4 or 5 months. They were at a party drinking and then went to his room. They started kissing and when he touched the complainant’s vagina, she said no. She was intoxicated and the defendant had sex with her.” The report noted that defendant was still under the weekly care of his psychiatrist, Dr. Frank, and that defendant “expressed remorse for his actions.” Costello recommended a jail sentence, stating in capital letters: “HE IS NOT A CANDIDATE FOR PROBATION AGAIN!”
In Supreme Court, New York County, on October 14, 2004, Judge Ambrecht sentenced defendant to six months’ incarceration to run concurrently with the Sullivan County jail term, followed by 10 years of probation. In open court, defendant was handed an order listing the conditions of probation, which he signed. Among the conditions is the requirement that defendant undergo “psychiatric or other appropriate treatment.” In addition, defendant is prohibited from leaving New York City without first obtaining the permission of the court or the Department of Probation.
On November 4, 2004, defendant was disbarred.
On November 8, 2004, defendant’s sex offender risk level was raised from level one to level two. In addition, he was designated a sexually violent offender (a sex offender convicted of a sexually violent offense under Correction Law § 168-a [3]) and a predicate sex offender (a sex offender who has been previously convicted of a sex offense under Correction Law § 168-a [2]).
On September 26, 2005, defendant brought a motion seeking “permission to leave New York City upon notice to the Department of Probation.” In a report to the court dated October 5, 2005, Probation Officer Thierry Boubert opposed the motion, stating:
“any travel that he does outside of the jurisdiction will require the Probation Department to notify that [sítate of the probationer’s presence in their jurisdiction, to which they can deny him permission to be there as a matter of their own public safety. In addition, the Probation Department cannot be assured that the probationer will provide accurate and truthful information regarding his whereabouts . . . .”
Defendant ultimately withdrew the motion, apparently because the parties reached an off-the-record agreement whereby defendant was to request permission to travel by letter to the court and Probation.
*452 The arrangement did not go smoothly and, after several months, Officer Boubert lodged a complaint with Judge Ambrecht. In a proceeding on September 19, 2006, the judge chastised defendant, threatening revocation of probation and incarceration:
“Mr. Weitz, I have to tell you, I’m concerned and this is why. At the time you were sentenced to probation, probation voiced opposition to allowing you to leave the jurisdiction. And I was convinced through the persuasiveness of your attorney that it would be best if you were allowed to pursue gainful employment rather than be restricted, provided that you provided the probation officer with your itinerary. While you’ve done that, sometimes only on the eve of when you’re going to travel, I’m concerned that you misinterpreted this Court’s accommodation and you may have thought that somehow my allowing you to travel diminished the probation officer’s authority to supervise you. And I am told that your attitude is very poor. And, in fact, arrogant. I’m warning now, that’s unacceptable. If those kinds of reports continue, you will be violated, and I’ll sentence you to state prison.”
Defendant’s then attorney conceded that defendant had submitted over two dozen letters to Judge Ambrecht, 21 of which “were on three days’ notice or less.” The judge remarked: “I wasn’t happy about that either. So I’m sympathetic to Officer Bubert [sic].”
Evidence Adduced at the Hearing
Rabbi Salzman is the spiritual leader of the Young Israel of Brighton Beach synagogue and the director of Chabad of Kingsboro. He is a graduate of the Oholei Torah rabbinical college. The Rabbi is married and has six children.
Rabbi Salzman stated that about six years ago, defendant started attending Young Israel. Defendant grew more religious, studying the Torah consistently and praying at the synagogue three times a day. He is a frequent guest at the Rabbi’s home for the Friday night Sabbath meal.
Rabbi Salzman explained that in Orthodox Judaism, men and women who are not married to each other are not allowed to touch, except for a quick handshake. The Rabbi, however, holds himself to a “higher standard” and avoids even shaking hands with the opposite gender. Sex crimes, he explained, are “a great offense in the Jewish faith.”
*453 Rabbi Salzman testified that defendant is “[t]oday as far as I know, a hundred percent observant orthodox Jew, which is why I am here to explain that he changed.” Although the Rabbi has no training in the treatment of sex offenders, in his opinion, because defendant has raised his “conscience and spiritual self,” the probability of his reoffending is “one out of a thousand.” Defendant should no longer be subject to probation, the Rabbi concludes, because defendant now leads a religious life.
In addition to Rabbi Salzman’s testimony, defendant submitted, as proof of his rehabilitation, a document from Mustard Seed, the sex offender relapse prevention program mandated by the Department of Probation. Titled “Compliance Letter” and authored by William C. Ford, a social worker, the letter states that defendant’s primary treatment goals were to “identify and correct the root causes of his involvement in the sexual offense and to improve and better understand the psychological dynamics of all of his relationships.” Ford does not say, however, whether defendant achieved those objectives.
The letter offers general observations about defendant. Ford states, for example, that defendant has “benefitted from treatment ...[,] appears to have improved insight and judgment ...[,] the ability to express remorse for others . . . and is capable of avoiding high risk situations.” Yet Ford provides no information about defendant’s specific problems and no details about his treatment.
At the end of the letter, Ford concludes that defendant “is not seen as a . . . significant risk to the community at this time.” But, in reaching that conclusion, Ford notes that he is relying on “actuarial and expert research . . . [which finds] that an individual’s risk for re-offending is less likely when enrolled, engaged in, and compliant with treatment.” (Emphasis added.) Ford does not reference specific studies or evaluate how the research applies to defendant as an individual. Nor does Ford state whether defendant would pose a danger to the community if he were not attending group therapy sessions at Mustard Seed — an option defendant could elect were probation terminated.
Defendant testified that when his father died in 1988, he became religious, “I went to schul three times a day .... Then I stopped unfortunately. . . . Instead of sitting shiva, I clerked for Judge Patterson. That’s when I started to socialize and drink.” Hanging out in bars and drinking to excess, defendant explained, gave rise to “some bad behavior.”
*454 Defendant said that since his release from jail in 2005, he has adopted a “good life.” Defendant works at a marketing and public relations firm where he represents “very well-known painters” and sports figures. He “surround[s] [himself] with the best rabbi, with the best friends,” does not drink alcohol and does not keep company with “destructive people.” Defendant has rededicated himself to religion. As was his practice in 1988, defendant now prays three times a day. He stated, “I study and read and I donate.” In addition, defendant has “done charity work over the last eight years” which makes him “feel less guilty.”
Once a month, defendant attends Mustard Seed, which he described as “a preventive type of therapy for me, at least that’s the program they put me in.” He reported that during group therapy sessions, “people cry over the feelings they have when they talk about each other’s victims.” Defendant continues to see his psychiatrist, Dr. Frank, once or twice a month.
Defendant complained that probation impedes his “moving on” with life. In particular, defendant testified, his status as a probationer is a hindrance to his marriage prospects. He stated:
“I think that it’s much harder to sit down with a woman in six months, if I decide to marry her, it’s easier to tell her what happened and that it’s in the past, as opposed to probation officers knocking on doors and me being on probation. . . . I’m moving on, I straightened out my life and I need to get married and put this behind me.”
Defendant added, “I have a date tonight with a 38-year-old psychotherapist that respects the fact that I live like this. She doesn’t know that I’m on probation at the moment but eventually she will.”
Defendant offered contradictory testimony on several issues. For example, right after declaring, “I don’t go to bars anymore,” defendant admitted that, in connection with his job in public relations, he goes to bars with NFL clients. On direct examination, defendant insisted that he had changed his “whole lifestyle” and that “[a] 11 the triggers are gone.” But when confronted by ADA Lynn, defendant confessed that, together with professional athletes, he regularly attends press events that feature liquor and women. During direct examination, defendant complained about limitations on his travel, but acknowledged, on cross, that he enjoys “the right to travel upon emailing the probation department.” And, in one breath, de *455 fendant denied, and then offered a qualified admission of culpability for his actions: “I was always in a situation that the underlying allegations were not true. I take full responsibility for what I pled guilty to and the victims.” (Emphasis added.)
Law
The Sexual Assault Reform Act of 2000 overhauled penalties for sex crimes. (L 2000, ch 1, as amended.) The periods of probation were doubled, in order to better track and monitor sex offenders. (Attorney General’s Mem in Support, Bill Jacket, L 2000, ch 1 at 5.) For felony sexual offenses, the mandatory probationary term was increased from 5 to 10 years. (Penal Law § 65.00 [3] [a] [iii].) The period of probation for class A misdemeanors rose from three to six years. (Penal Law § 65.00 [3] [b] [ii].)
A defendant may be discharged from probation before the full term is completed, if the court determines that continued supervision is no longer necessary. (People v Rodney E., 77 NY2d 672, 676 [1991].) The judge must grant early termination if she “is of the opinion” that: a defendant does not need the guidance, training or other assistance provided by probation; the probationer has diligently complied with the terms and conditions of probation; and termination is not adverse to the protection of the public. (GPL 410.90 [3] [a].)
In sentencing matters, New York judges are accorded considerable latitude. (People v Day, 73 NY2d 208, 212 [1989].) The “sentencing decision is a matter committed to the exercise of the court’s discretion . . . made only after careful consideration of all facts available at the time of sentencing.” (People v Farrar, 52 NY2d 302, 305 [1981].) A “court must exercise its discretion at sentencing, notwithstanding that a sentence was negotiated at the time of the plea . . . .” (Id. at 308.)
A sentencing judge “may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.” (United States v Grayson, 438 US 41, 50 [1978], quoting United States v Tucker, 404 US 443, 446 [1972].)
“To aid a judge in exercising this discretion the New York procedural policy encourages him to consider information about the convicted person’s past life, health, habits, conduct, and mental and moral propensities. The sentencing judge may consider such information even though obtained outside the *456 courtroom from persons whom a defendant has not been permitted to confront or cross-examine.” (Williams v New York, 337 US 241, 245 [1949].)
The sentencing court may rely on information contained in a presentence report (People v Selikoff, 35 NY2d 227 [1974]), which may include “the circumstances attending the commission of the offense” and the defendant’s criminal, social, employment, family, economic, educational, and personal history. (CPL 390.30 [1].) Indeed, the presentence report “may well be the single most important document at both the sentencing and correctional levels of the criminal process.” (People v Hicks, 98 NY2d 185, 189 [2002] [internal quotation marks and citations omitted].) In reviewing a defendant’s history, the sentencing judge may consider offenses for which the defendant was not prosecuted or convicted (People v Migliore, 150 AD2d 169, 170 [1st Dept 1989]), “provided the court is satisfied that ‘the information upon which it bases the sentence is reliable and accurate.’ ” (People v Styles, 285 AD2d 564, 564-565 [2d Dept 2001].)
Discussion
The first step in the process of the rehabilitation of a sex offender is assessment. The threshold questions are: what is wrong with the defendant? what led him to commit a sexual assault? and how can the problem be remedied? A trained and experienced mental health professional should conduct an in-depth evaluation of the defendant, identifying the specific internal and external factors that contributed to his sexually assaultive conduct. This leads to the development of an individualized treatment plan designed to address the identified problems. The goal of treatment is to reduce the risk of reoffending. A court measures rehabilitation by evaluating what changes have occurred in a defendant over time. Therefore, a sex offender seeking early termination of probation under Criminal Procedure Law § 410.90 must adduce evidence of demonstrated progress since the commencement of the probationary term.
Although defendant has been under the psychiatric care of Dr. David L. Frank for 24 years, defendant did not call Dr. Frank, or any other mental health expert, as a witness on the issue of rehabilitation. Nor did defendant submit an updated report from Dr. Frank. The only evidence from Dr. Frank is his 2002 evaluation of defendant as excerpted in the Sullivan County probation report, which quotes the psychiatrist’s de *457 scription of defendant’s adverse childhood environment and his “difficulties in major areas of mental functioning, including anxiety, anger control, rejection sensitivity, self-defeating behavior, obsessive symptoms, and problematic judgment.” Nor did defendant call as a witness, William C. Ford, defendant’s relapse prevention therapist of four years, whose circumspect “Compliance Letter” is of no evidentiary value beyond proof of attendance. Nor did defendant challenge the current validity of the 2004 findings of the Board of Examiners of Sex Offenders, which rate him a moderate threat to public safety.
Instead, defendant offered his own assessment of what led to his commission of sex offenses: drinking liquor in the presence of women. Defendant testified that he has a “type of inclination” and that he “acted on it because [he] was drinking, because [he] lived a life-style that was conducive to put [himself] in that position, going out every night, drinking, going to good events press things.” Defendant’s explanation is unconvincing. Although alcohol may play a contributing role in the commission of a sexual assault, by diminishing a defendant’s rationality and self-control, the use of alcohol is insufficient to account for the offense. Many people get drunk; relatively few commit sex crimes.
I reject defendant’s claim that he has changed his “whole lifestyle” — that he now avoids the situations which triggered past “bad behavior.” Defendant regularly entertains clients at establishments where liquor is served and women are present— the same circumstances which preceded his 2003 sexual assault on a woman in her twenties and culminated in his incarceration and the extant sentence of probation. Inexplicably, defendant provided no evidence that he has sought treatment for alcohol abuse. This is highly worrisome, considering defendant’s contention that drinking to excess drove him to commit the felony sex crime that cost him his legal career.
A combination of other troubling factors point to the conclusion that defendant is less than rehabilitated. Defendant’s attributing his sexually assaultive conduct to a state of intoxication and his claim that he was a victim of circumstance (“I was always in a situation that the underlying allegations were not true”), signal that he does not accept full responsibility for his actions, notwithstanding his guilty pleas. His characterization of the offenses as “some bad behavior” and his testimony simultaneously denying culpability and offering a qualified admission of guilt “for what [he] pled guilty to,” illustrate his *458 unchanged minimization of the seriousness of his crimes. Defendant’s choice of tactics — targeting women who are too impaired to give consent, either by taking advantage of the fact that his victim was drinking heavily or by actively facilitating her intoxication — demonstrates extreme egocentrism and lack of empathy. Moreover, while on the stand, defendant did not express authentic contrition or genuine concern for the women he hurt. Instead, he detached himself, reporting that in sex offender group therapy sessions “people cry over the feelings they have when they talk about each other’s victims.” (Emphasis added.)
Defendant testified to the importance of religion in helping him face his daily struggle against what defendant described as his “type of inclination.” He stated:
“I had material pleasures in the life I was leading. That’s overcome by your connection with God to find that God’s soul that is buried inside of all of us, that if you don’t find, you are just going to follow your pleasures. Use your God soul, the part that wants to be good to people, that wants to go out in the world and just be a good person. That soul is in conflict to the time when our soul that wants to have pleasure. That’s the soul that got me in trouble before, that part that wanted me to have pleasure.
“Every day I get up in the morning, I say a prayer. And the prayer is that God gives me the strength to just bang this part of my soul down and live a good life and get rid of all that other stuff that’s in all of us.”
Although defendant may rely upon prayer to help him resist temptation, he cannot use the practice of religion as the basis for premature termination of mental health treatment or supervision by the Department of Probation. Defendant presented no evidence linking religion to a reduction in sex offender recidivism. Indeed, defendant’s becoming religious in 1988 did not prevent him from committing a sex crime three years later. Clearly, religious faith may play a crucial role in preventing reoffending, but it must be combined with treatment and monitoring by the Department of Probation.
In 2003, while on probation for the sex offense he committed in Sullivan County, defendant sexually assaulted another woman in Manhattan. And, in 2006, about two years after Judge Ambrecht’s imposition of a sentence of probation, the judge excoriated defendant for resisting the Department of Probation’s *459 exercise of its authority to restrict and monitor his travelling. Judge Ambrecht found defendant’s conduct and attitude so objectionable that he threatened to terminate probation and incarcerate him. Defendant, therefore, cannot satisfy the second precondition to early termination in CPL 410.90 (3) (a), which requires a showing that the probationer “has diligently complied with the terms and conditions” of probation.
Defendant’s attorney initiated this proceeding “urg[ing] the Court to grant a hearing to afford [defendant the opportunity to affirmatively demonstrate that rehabilitation has been amply achieved.” Counsel argued that defendant’s probationary term should be cut short, to enable defendant “to travel freely so as to meet with spiritual leaders . . . and better serve his clients out of New York.” Although defendant conceded, in his supporting affidavit, that he has “travelled when, and to the extent necessary, to serve [his] clients,” he stated that he was seeking termination, so that he may take trips for “business and pleasure” and to “pursue his spiritual side.” Curiously, Rabbi Salzman, defendant’s religious advisor, did not recommend, during his testimony, that defendant travel for religious purposes.
I am not persuaded that relaxation of travel restrictions is the true motivation underlying this motion. For years defendant has enjoyed the freedom to travel at the click of an email to the Department of Probation. He must seek preapproval, but the restrictions are not unreasonably burdensome. Travel is a pretextual reason.
Defendant seeks early termination, because he believes that being on probation presents a roadblock to marriage. On the stand, defendant explained that it would be “easier to tell [a prospective wife] what happened and that it’s in the past, as opposed to probation officers knocking on doors . . . .” Defendant admitted that he has not informed the woman he is dating that he is on probation, but claims that he will tell her “eventually.” I do not believe him. Defendant does not understand that it is not his status as a probationer that is a hindrance to marriage, it is his history of sexual assaults. Defendant’s concealment of his past does not portend well and constitutes yet another indication that defendant is not rehabilitated. This court will not facilitate the perpetuation of defendant’s pattern of deceit and manipulation.
Conclusion
To prove rehabilitation and prevail on this motion to terminate probation, defendant, a level two sex offender, must *460 establish, by a preponderance of the evidence, that he has a mature awareness and understanding of the traits, issues and conditions which activated or supported his commission of a sexual assault on a woman who was too impaired to consent and persuade this court that he has control over his behavior and is unlikely to commit another sex crime. He has failed in all respects.
Accordingly, the motion is denied.