IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 12, 2019

## STATE OF TENNESSEE v. ARBRA ALLEN SIMS III

**Appeal from the Criminal Court for Davidson County**
**No. 2017-C-2115    Angelita Blackshear Dalton, Judge**

_____

### No. M2018-01296-CCA-R3-CD

_____

Defendant, Arbra Allen Sims III, pled guilty to two counts of accessory after the fact to aggravated robbery. Defendant agreed to serve four years on each count concurrently with the manner of service to be determined by the trial court. Following a sentencing hearing, the trial court ordered Defendant to serve the sentence in custody with the possibility of release pending the completion of a rehabilitative program. On appeal, Defendant argues that he should have been granted probation and that the trial court abused its discretion by relying solely on Defendant's perceived untruthfulness about his participation in the underlying crime. We hold that the trial court did not abuse its discretion, and we affirm the trial court's decision to deny probation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**
**and Remanded**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Shaw Cunningham (at trial), and Jay Umerley (on appeal), Nashville, Tennessee, for appellant, Arbra Allen Sims III.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Brian Rachmaciej, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

Defendant was originally indicted by a Davidson County Grand Jury on two counts of aggravated robbery (Counts 1 and 2), one count of attempted aggravated robbery (Count 3), and one count of aggravated assault (Count 4). On May 9, 2018, Defendant pled guilty to two counts of accessory after the fact to aggravated robbery, a Class E felony, amending the charges in Counts 1 and 2. Counts 3 and 4 were dismissed. Pursuant to *Hicks v. State*, 945 S.W.2d 706 (Tenn. 1997), Defendant, a Range I offender, agreed to an out-of-range sentence of four years on each count to be served concurrently with the trial court to determine the manner of service following a sentencing hearing. *See* T.C.A. §§ 40-35-111(5), -112(a)(5).

During the plea colloquy, Defendant agreed with the State's recitation of the facts as "basically true":

> [O]n June 12th of 2017[, Defendant] and his co-defendant . . . were walking in the one thousand block of Villa Place. The victims Molly Smith, Jan White, and Robert Murray . . . were walking northbound on Villa Place and after crossing over Tremont Street the two defendants approached them. [The co-defendant] displayed a handgun at the three victims taking property from Molly Smith and Jan White while [Defendant] stood by. During the preliminary hearing . . . all three victims testified that [Defendant] did not make any demands, did not have a weapon, and did not take any of the items from them[;] . . . however, later in the investigation[,] the items taken from the victims were located at [Defendant's] residence.

The trial court accepted Defendant's guilty plea and conducted a two-part sentencing hearing.

*Sentencing Hearing*

The first day of the sentencing hearing consisted of testimony from Detective Jonathan McGowen and two of the victims, Mr. Murray and Ms. White. Detective McGowen testified that on June 12, 2017, he responded to a call about an aggravated robbery around the one-hundred block of Villa Place in Davidson County. After arriving at the scene, Detective McGowen spoke with the three victims. Detective McGowen collected video surveillance from a nearby house and neighboring shopping center, and he was able to identify Defendant and the co-defendant from previous interactions. The surveillance showed Defendant and the co-defendant in the same area as the robbery within one to two minutes of the crime. The video did not have footage of the robbery and did not show Defendant carrying a weapon.

Shortly after the crime was reported to police, the co-defendant was apprehended near Edgehill Avenue in close proximity to Defendant's mother's home. Detective McGowen compiled photographic lineups and showed the victims, but only remembered

one victim who was able to positively identify Defendant.[1]  As a result of the robbery, Ms. Smith's and Ms. White's purses, cash, and cellphones were taken; however, the purses were located the following day in a trashcan on 14th Avenue South, a few streets from where the robbery occurred.  Four days after the robbery, Detective McGowen executed a search warrant at Defendant's mother's home on Edgehill Avenue and recovered the cellphones and "clothing consistent with what [Defendant] was wearing during the robbery."  While Detective McGowen and other officers were executing the search, Defendant turned himself in to the South Precinct.

Mr. Murray testified that around one o'clock in the afternoon, he, his wife, Ms. White, and his wife's friend, Ms. Smith, left Taco Mamacita, a local restaurant.  While walking towards their residence on Villa Place, Mr. Murray spotted two individuals on the opposite side of the street.  When Mr. Murray reached what he believed to be the twelve-hundred block, he noticed the two individuals looking at his group and remembered Defendant walking halfway across the street to examine the group before returning to the co-defendant on the sidewalk.  Mr. Murray asked Ms. White and Ms. Smith to walk in front of him, because he believed that the two individuals may try to approach the group from behind.  After the group passed by a van parked on the road, Mr. Murray saw the two individuals "coming at [the group]."  The co-defendant pulled out a gun, and Mr. Murray stated that Defendant "basically disappeared behind [the group]."  The co-defendant pointed the gun at Mr. Murray and said, "give it up," before waiving the gun towards Ms. White and telling her to "give it up."  Ms. Smith hesitated to give up her belongings, and the co-defendant "got right in her face at that point."

Mr. Murray did not remember Defendant holding a weapon, saying anything, or physically taking anything; however, Mr. Murray explained that the robbery was "kind of a blur," and it was "played as if it were a sport's play[,] . . . [and Defendant] was the receiver[.]"  Additionally, Mr. Murray described that the entire robbery lasted approximately ten to fifteen seconds.  As a result of being robbed and held at gunpoint, Mr. Murray described feeling like he was "walking on the balls of [his] feet all the time[,]" and that it was something he and Ms. White worried about when they went on vacation, took the trash out, and walked the dog.  When asked about his opinion regarding Defendant's sentence, Mr. Murray stated that he "hate[d] to see somebody give up his whole life over something so ridiculously stupid," but if the State and trial court decided to send Defendant to jail, he understood and stated it would be akin to the saying: "you do the crime you do the time."

---

[1] No photographic lineups were entered as exhibits to the hearing.  Ms. Smith's victim-impact statement explains that all three victims were shown a photographic lineup on the day of the robbery and "all three identified the same person [who] put the gun to [them]."  She also explained that Detective McGowen asked her to look at another photographic lineup the following day, but she had already left town.

Next, Ms. White testified about her experience being robbed at gunpoint by Defendant and the co-defendant. Ms. White affirmed Mr. Murray's recount of the robbery and reiterated how quickly the robbery transpired. Ms. White emphasized how the gun was within inches of her body and Mr. Murray's face, and at one point, the gun was in her chest. According to Ms. White, Defendant did not tell the co-defendant to stop, and Defendant did not seem reluctant to partake in the robbery. Ms. White stated that regardless of Defendant's plea agreement, she believed he was "a full participant in [the] robbery" who was "positively at the scene of [the] crime and an active participant." Similar to Mr. Murray, Ms. White testified that the robbery changed her life forever, made her a less trusting person, and made her scared to walk outside.

Additionally, Ms. White expressed that she felt hesitant about sending Defendant to jail and desired a "true rehabilitative program" where Defendant would receive training and community service, but she worried that Defendant would not learn the consequences of his actions and could potentially end up in a similar situation resulting in someone's death. Eventually, Ms. White requested that the trial court send Defendant to prison because she believed Defendant "was as guilty as the gunman . . . and was not fully convinced [Defendant] did not have a gun." Ms. White explained that she was afraid for Defendant to be out on the streets and that if the trial court was going to order Defendant to a term of probation, she requested a no contact order.

After Ms. White's testimony, the State read a victim-impact statement from Ms. Smith into the record. Ms. Smith explained that two black males robbed her and her friends at gunpoint while the group was walking back from lunch. Ms. Smith recounted that she was so frightened that she soiled her clothes. On the day of the robbery, Ms. Smith remembered picking the co-defendant out of a lineup, but she was unable to view the subsequent lineup of Defendant because she had to return to Memphis. When Ms. Smith returned for the preliminary hearing on this case, she identified Defendant as one of the individuals who robbed her. Finally, Ms. Smith opined that in addition to jail time, she would like to see Defendant testify against the co-defendant, but she also worried that this punishment would not be enough to teach Defendant a lesson.

Following Ms. Smith's victim-impact statement, the trial court took the testimony and exhibits under advisement and postponed the remainder of the sentencing hearing until defense counsel obtained Defendant's official pre-trial diversion eligibility report from the Tennessee Bureau of Investigation. The sentencing hearing resumed on July 6, 2018, and the defense called Defendant's sister, Arbrenya Maddox, and Defendant to testify.

Ms. Maddox testified that on the day of the robbery, Defendant walked in the house from getting a haircut and told her that the co-defendant was getting arrested in front of the house. When he walked in the door, Defendant was wearing sweatpants and a white t-shirt, and he was not carrying anything in his hands. Ms. Maddox remembered

that Defendant had his cellphone with him, and when she and Defendant stepped out onto the front porch to watch the arrest, the co-defendant asked to use Defendant's cellphone. According to Ms. Maddox's testimony, Defendant passed his cellphone to a neighbor who then handed the cellphone to the co-defendant. After the co-defendant was done using the cellphone, he passed Defendant's cellphone back to the neighbor, along with two other iPhones. Ms. Maddox maintained that Defendant never left the front porch.

In addition to witnessing the co-defendant pass two iPhones to Defendant, Ms. Maddox also testified that she knew the co-defendant to carry or possess multiple handguns on numerous occasions but that she never saw Defendant carry or possess a handgun. Ms. Maddox admitted she was not aware that in March, three months prior to the robbery in this case, Defendant was charged with unlawful possession of a handgun.

Next, Defendant took the stand and testified that on June 12, he had no plans to meet up with the co-defendant. Defendant was walking home from playing basketball and getting a haircut when he saw the co-defendant sitting on the curb. Defendant maintained that he did not know the co-defendant was planning to rob anyone that day and that he was unaware that the co-defendant had a handgun. Defendant stated, "[I]t shocked me because [the co-defendant] didn't give me no warning or nothing, it just happened out of nowhere, so I had to run away." Defendant explained that once he saw the gun, he ran into someone's backyard, hopped the fence, and continued a few blocks to his mother's house in Edgehill. Defendant also stated that the co-defendant was running behind him but that he must have been in the house for "five minutes" before he noticed the co-defendant getting arrested when someone "opened the door for some sunlight."

Additionally, Defendant affirmed that he passed his cellphone to the co-defendant through a neighbor, and that the neighbor passed back two additional cellphones from the co-defendant. Defendant admitted that he knew where the phones came from, and that he took them because he was scared and not thinking. Defendant agreed that he should not have taken the additional cellphones from the co-defendant. Defendant then apologized to the victims for attending the robbery, not giving the victims a warning, and not turning the cellphones in to the police.

Finally, Defendant explained that while in custody for a year he completed a brick masonry training program, earned his GED, and got accepted to Tennessee State University. Defendant expressed interest in playing basketball in college or starting his own brick masonry business, and he told the court that he wanted to spend more time with his nine-month-old daughter.

On cross-examination, Defendant admitted that in March of 2017, he pled guilty to a misdemeanor handgun possession charge and was given the option to complete a violence intervention program or serve two days in jail. Defendant chose the violence intervention program, so the trial court took his guilty plea under advisement in order for

him to complete the course. Defendant admitted that he took part in the robbery at issue in this case while his guilty plea on the handgun charge was under advisement. Defendant also acknowledged that police found a revolver while executing the search warrant at his mother's home and that after learning the police found certain items in the home, Defendant decided to turn himself in to police.

When asked specifically about his involvement in the robbery, Defendant testified to the following:

> [Co-defendant and I] w[ere] sitting down on the cur[b] and then we saw the victims and the witness walk pas[sed] us. [The victims] walk[ed] pas[sed] us and went behind the truck and when they got out of vision so that they couldn't see us and we couldn't see them. So [co-defendant and I] went from behind and next thing you know I saw a gun and I took off running.

Defendant denied ever walking to the middle of the street like Mr. Murray described in his testimony. Defendant admitted that in his earlier statement to Detective McGowen, he described that both he and the co-defendant ran together through a backyard after the robbery and stopped at a local grocery store before walking back to the Edgehill homes. Additionally, Defendant acknowledged that he took possession of the cellphones from the co-defendant, but stated he was only holding on to them until the co-defendant came back to get them. Finally, Defendant stated that if the trial court were to grant him probation, he would live with his uncle and cousin in Antioch.

In addition to testimony at the sentencing hearing, the State admitted Defendant's pre-sentence report as an exhibit to the hearing. The pre-sentence report indicated that Defendant was eighteen at the time of this offense and had one prior misdemeanor conviction. Defendant attended high school until the twelfth grade but did not earn enough credits to graduate. The pre-sentence report noted that Defendant earned his GED and completed a job training program through Job Corp. There was no indication of alcohol or drug abuse, but the pre-sentence report did indicate that Defendant started using marijuana when he was fifteen years old. The pre-sentence report did not provide proof or history of steady employment but expressed strong and supportive familial relationships between Defendant and other family members. Defendant's risk and needs assessment resulted in a score of high for violence, property, and drugs. Based on those findings, the pre-sentence investigator recommended pro-social life skills, drug assessment and treatment, and employment.

At the end of the sentencing hearing, the trial court took notice of the present and lasting impact of the robbery on the victims and Defendant. The trial court underscored that after listening to Defendant's testimony, the trial court questioned Defendant's honesty with the court and himself regarding his involvement in the robbery that day. When comparing the victims' testimony, Defendant's prior statements to Detective

McGowen, and Defendant's testimony at the sentencing hearing, the trial court explained that Defendant's own statements indicated that he participated in the robbery but was now trying to claim that he was only an accessory after the fact. The trial court also noted the impact of the crime on both the victims and Defendant and the seriousness of the offense.

As a result, the trial court ordered Defendant to serve his four-year sentence in custody. Additionally, the trial court strongly encouraged Defendant to participate in the Jericho Program, a six-month rehabilitative program. The trial court stated that upon successful completion of that program "suspend your sentence to probation for you to comply with the Men of Valor aftercare program." Further, the trial court reasoned that just releasing the Defendant without any structure was not a viable course of action if Defendant were to learn the consequences of his actions. The trial court additionally expressed concern about the documentation in regard to Defendant's prior misdemeanor charge[2] and that the offense also showed Defendant's unwillingness to be honest and take responsibility. The trial court did not specifically reference enhancing or mitigating factors on the record.

*Analysis*

When a defendant challenges the length, range, or manner of service of a sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *Caudle*, 388 S.W.3d at 278-79. In determining an appropriate sentence, the trial court must consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;
(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

---

[2] The documents relating to Defendant's prior misdemeanor charge were not included in the record.

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

T.C.A. § 40-35-210(b)(1)-(7)

When the trial court orders confinement rather than an alternative sentence like probation, it must base its decision on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103. Further, the sentence should be the least restrictive means necessary to effectuate the purposes of the sentence imposed and should be no greater than deserved for the offense. *See id.* §§ 40-35-103(2), (3). The trial court must consider the defendant's potential, or lack thereof, for rehabilitation or treatment, and the sentence length or alternative sentence term "may reflect the length of the treatment rehabilitation program in which participation is a condition of the sentence[.]" *Id.* § 40-35-103(5).

The 2005 Amendments to the Tennessee Criminal Sentencing Reform Act ("Sentencing Act") provide that "[a] defendant shall be eligible for probation . . . if the sentence actually imposed upon the defendant is ten (10) years or less[,]" and the defendant is not otherwise statutorily barred from consideration. *Id.* § 40-35-303(a); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). A defendant is no longer entitled to or afforded the presumption that he or she is a favorable candidate for probation, and the burden rests with the defendant to establish his or her suitability for probation. *Carter*, 254 S.W.3d at 347. "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Id.* (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997) (citation omitted)).

Here, Defendant argues that the trial court abused its discretion because it considered Defendant's untruthfulness as the sole factor for incarceration. Further, Defendant argues that it was improper for the trial court to order confinement based on the fact that Defendant would not admit full participation in the underlying crime of

- 8 -

aggravated robbery when Defendant admitted the facts associated with his crime of conviction, accessory after the fact. Regarding proper sentencing considerations, this Court has upheld a trial court's consideration of the original indicted offense when a defendant pled guilty to a lesser offense. *See State v. Daniel Clarke Doyle*, No. W2012-02745-CCA-R3-CD, 2014 WL 217299, at *1, *6-8 (Tenn. Crim. App. Jan. 17, 2014) (examining a situation where the defendant was indicted for statutory rape by an authority figure and pled to the lesser offense of statutory rape; the trial court considered the defendant's position of trust as a teacher at the victim's school as a factor in denying judicial diversion), *perm. app. denied* (Tenn. May 15, 2014). Additionally, in *United States v. Grayson*, the United States Supreme Court held that it was proper for the trial court to consider a defendant's untruthfulness when he testified on his own behalf at trial in determining whether the defendant was a good prospect for rehabilitation during sentencing. 438 U.S. 41, 50 (1978), *superseded by statute on other grounds as stated in Barber v. Thomas*, 560 U.S. 474, 478 (2010). This same reasoning was affirmed in *State v. Bunch*, when our supreme court held that it was not improper for the trial court to consider a defendant's untruthfulness as a factor in denying probation. 646 S.W.2d 158, 160 (Tenn. 1983) (citing *State v. Gautney*, 607 S.W.2d 907, 910 (Tenn. Crim. App. 1980)); *see also State v. Nunley,* 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999) ("Lack of candor and credibility are indications of a defendant's potential for rehabilitation."); *State v. Poe*, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981).

Defendant was originally charged with two counts of aggravated robbery, one count of attempted aggravated robbery, and one count of aggravated assault. The indictment was later amended, and Defendant pled guilty to two counts of the lesser-included offense of accessory after the fact to aggravated robbery. Because aggravated robbery was part of Defendant's originally charged and indicted offenses, it was not an abuse of discretion for the trial court to consider the underlying charge when making its decision to order confinement. *See Daniel Clarke Doyle*, 2014 WL 217299, at *6-8. Further, the trial court found that Defendant was untruthful based on a comparison of Defendant's prior statements to Detective McGowen, Defendant's testimony at the sentencing hearing, the victims' testimonies at the sentencing hearing, and Defendant's prior criminal history. It was not an abuse of discretion for the trial court to find that Defendant was untruthful or to consider and rely on that finding as a basis for denying Defendant probation. *See Bunch*, 646 S.W.2d at 160.

The record shows that the trial court also considered the impact of the crime on the victims and the seriousness of the offense. The trial court determined that Defendant's untruthfulness was a sign that he was not ready to accept responsibility and therefore needed a more structured rehabilitation program before being released back in to the community on probation. Certainly a sentence involving confinement coupled with the opportunity to participate in the Jericho Program can provide that structure. Because the trial court considered necessary sentencing considerations and sentencing alternatives, the

sentence is consistent with the purposes and principles of our sentencing laws. The trial court did not abuse its discretion.

## *Conclusion*

Based on the foregoing and the record as a whole, we affirm the trial court's decision to deny probation. However, we remand this case to the trial court for entry of judgments reflecting the dismissal of Counts 3 and 4 of the indictment. *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) (citing Tenn. R. Crim. P. 32(e)(3)).

_____
TIMOTHY L. EASTER, JUDGE