# UNITED STATES *v.* GRAYSON

No. 76–1572.  Argued February 22, 1978—Decided June 26, 1978

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, and STEVENS, JJ., joined.  STEWART, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post,* p. 55.

*Solicitor General McCree* argued the cause for the United States.  With him on the briefs were *Assistant Attorney Gen-*

*eral Civiletti, Kenneth S. Geller, Sidney M. Glazer,* and *Paul J. Brysh.*

*John M. Humphrey* argued the cause and filed a brief for respondent.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to review a holding of the Court of Appeals that it was improper for a sentencing judge, in fixing the sentence within the statutory limits, to give consideration to the defendant's false testimony observed by the judge during the trial.

I

In August 1975, respondent Grayson was confined in a federal prison camp under a conviction for distributing a controlled substance. In October, he escaped but was apprehended two days later by FBI agents in New York City. He was indicted for prison escape in violation of 18 U. S. C. § 751 (a) (1976 ed.).

During its case in chief, the United States proved the essential elements of the crime, including his lawful confinement and the unlawful escape. In addition, it presented the testimony of the arresting FBI agents that Grayson, upon being apprehended, denied his true identity.

Grayson testified in his own defense. He admitted leaving the camp but asserted that he did so out of fear: "I had just been threatened with a large stick with a nail protruding through it by an inmate that was serving time at Allenwood, and I was scared, and I just ran." He testified that the threat was made in the presence of many inmates by prisoner Barnes who sought to enforce collection of a gambling debt and followed other threats and physical assaults made for the same purpose. Grayson called one inmate, who testified: "I heard

[Barnes] talk to Grayson in a loud voice one day, but that's all. I never seen no harm, no hands or no shuffling whatsoever."

Grayson's version of the facts was contradicted by the Government's rebuttal evidence and by cross-examination on crucial aspects of his story. For example, Grayson stated that after crossing the prison fence he left his prison jacket by the side of the road. On recross, he stated that he also left his prison shirt but not his trousers. Government testimony showed that on the morning after the escape, a shirt marked with Grayson's number, a jacket, and a pair of prison trousers were found outside a hole in the prison fence.[1] Grayson also testified on cross-examination: "I do believe that I phrased the rhetorical question to Captain Kurd, who was in charge of [the prison], and I think I said something if an inmate was being threatened by somebody, what would . . . he do? First of all he said he would want to know who it was." On further cross-examination, however, Grayson modified his description of the conversation. Captain Kurd testified that Grayson had never mentioned in any fashion threats from other inmates. Finally, the alleged assailant, Barnes, by then no longer an inmate, testified that Grayson had never owed him any money and that he had never threatened or physically assaulted Grayson.

The jury returned a guilty verdict, whereupon the District Judge ordered the United States Probation Office to prepare a

---

[1] The testimony regarding the prison clothing was important for reasons in addition to the light it shed on quality of recollection. Grayson stated that after unpremeditatedly fleeing the prison with no possessions and crossing the fence, he hitchhiked to New York City—a difficult task for a man with no trousers. The United States suggested that by pre-arrangement Grayson met someone, possibly a woman friend, on the highway near the break in the fence and that this accomplice provided civilian clothes. It introduced evidence that the friend visited Grayson often at prison, including each of the three days immediately prior to his penultimate day in the camp.

presentence report. At the sentencing hearing, the judge stated:

"I'm going to give my reasons for sentencing in this case with clarity, because one of the reasons may well be considered by a Court of Appeals to be impermissible; and although . I could come into this Court Room and sentence this Defendant to a five-year prison term without any explanation at all, I think it is fair that I give the reasons so that if the Court of Appeals feels that one of the reasons which I am about to enunciate is an improper consideration for a trial judge, then the Court will be in a position to reverse this Court and send the case back for re-sentencing.

"In my view a prison sentence is indicated, and the sentence that the Court is going to impose is to deter you, Mr. Grayson, and others who are similarly situated. Secondly, *it is my view that your defense was a complete fabrication without the slightest merit whatsoever. I feel it is proper for me to consider that fact in the sentencing, and I will do so.*" (Emphasis added.)

He then sentenced Grayson to a term of two years' imprisonment, consecutive to his unexpired sentence.[2]

On appeal, a divided panel of the Court of Appeals for the Third Circuit directed that Grayson's sentence be vacated and that he be resentenced by the District Court without consideration of false testimony. 550 F. 2d 103 (1977). Two judges concluded that this result was mandated by language in a prior decision of the Third Circuit, *Poteet* v. *Fauver,* 517 F. 2d 393, 395 (1975): "[T]he sentencing judge may not add a penalty because he believes the defendant lied." One judge, in a concurring opinion, suggested that the District Court's reliance on Grayson's false testimony in fixing the sentence

---

[2] The District Court in this case could have sentenced Grayson for any period up to five years. 18 U. S. C. § 751 (a) (1976 ed.).

"trenches upon a defendant's constitutional privilege to testify in his own behalf as well as his right to have criminal charges," such as one for perjury, formally adjudicated "pursuant to procedures required by due process." 550 F. 2d, at 108. The dissenting judge challenged both the applicability of *Poteet* and the suggestion that the District Court's approach to Grayson's sentence was constitutionally impermissible.

We granted certiorari to resolve conflicts between holdings of the Courts of Appeals.[3] 434 U. S. 816 (1977). We reverse.

## II

In *Williams* v. *New York,* 337 U. S. 241, 247 (1949), Mr. Justice Black observed that the "prevalent modern philosophy of penology [is] that the punishment should fit the offender and not merely the crime," and that, accordingly, sentences should be determined with an eye toward the "[r]eformation and rehabilitation of offenders." *Id.,* at 248. But it has not always been so. In the early days of the Republic, when imprisonment had only recently emerged as an alternative to the death penalty, confinement in public stocks, or whipping in the town square, the period of incarceration was generally prescribed with specificity by the legislature. Each crime had its defined punishment. See Report of Twentieth Century Fund Task Force on Criminal Sentencing, Fair and Certain Punishment 83–85 (1976) (Task Force Report). The "excessive rigidity of the [mandatory or fixed sentence]

---

[3] Compare the decision in the present case, 550 F. 2d 103 (1977), and *Scott* v. *United States,* 135 U. S. App. D. C. 377, 419 F. 2d 264 (1969), with *United States* v. *Hendrix,* 505 F. 2d 1233 (CA2 1974), cert. denied, 423 U. S. 897 (1975); *United States* v. *Moore,* 484 F. 2d 1284 (CA4 1973); *United States* v. *Nunn,* 525 F. 2d 958 (CA5 1976); *United States* v. *Wallace,* 418 F. 2d 876 (CA6 1969), cert. denied, 397 U. S. 955 (1970); *United States* v. *Levine,* 372 F. 2d 70 (CA7 1967); *Hess* v. *United States,* 496 F. 2d 936 (CA8 1974); *United States* v. *Cluchette,* 465 F. 2d 749 (CA9 1972); and *Humes* v. *United States,* 186 F. 2d 875 (CA10 1951).

system" soon gave way in some jurisdictions, however, to a scheme permitting the sentencing judge—or jury—to consider aggravating and mitigating circumstances surrounding an offense, and, on that basis, to select a sentence within a *range* defined by the legislature. Tappan, Sentencing Under the Model Penal Code, 23 Law & Contemp. Prob. 528, 529 (1958). Nevertheless, the focus remained on the crime: Each particular offense was to be punished in proportion to the social harm caused by it and according to the offender's culpability.[4] See, *e. g.,* Iowa Code of 1851, Tit. XXIV, ch. 182, §§ 3067, 3068, reprinted in S. Rubin, Law of Criminal Correction 131–132 (2d ed. 1973). The purpose of incarceration remained, primarily, retribution and punishment.

Approximately a century ago, a reform movement asserting that the purpose of incarceration, and therefore the guiding consideration in sentencing, should be rehabilitation of the offender,[5] dramatically altered the approach to sentencing. A fundamental proposal of this movement was a flexible sentencing system permitting judges and correctional personnel, particularly the latter, to set the release date of prisoners according to informed judgments concerning their potential for, or actual, rehabilitation and their likely recidivism. Task Force Report 82. Indeed, the most extreme formulations of the emerging rehabilitation model, with its "reformatory sentence," posited that "convicts [regardless of the nature of their crime] can never be rightfully imprisoned except upon proof that it is unsafe for themselves and for society to leave them free, and when confined can never be rightfully released until they show themselves fit for membership in a free community." Lewis, The Indeterminate Sentence, 9 Yale L. J. 17, 27 (1899).

---

[4] See Task Force Report 88.

[5] The National Prison Association in its influential 1870 Declaration of Principles, asserted that "punishment is directed not to the crime but the criminal." *Id.,* at 93.

This extreme formulation, although influential, was not adopted unmodified by any jurisdiction. See Tappan, *supra,* at 531–533. "The influences of legalism and realism were powerful enough . . . to prevent the enactment of this form of indeterminate sentencing. Concern for personal liberty, skepticism concerning administrative decisions about prisoner reformation and readiness for release, insistence upon the preservation of some measure of deterrent emphasis, and other such factors, undoubtedly, led, instead, to a system—indeed, a complex of systems—in which maximum terms were generally employed." *Id.,* at 530. Thus it is that today the extent of a federal prisoner's confinement is initially determined by the sentencing judge, who selects a term within an often broad, congressionally prescribed range; release on parole is then available on review by the United States Parole Commission, which, as a general rule, may conditionally release a prisoner any time after he serves one-third of the judicially fixed term.[6] See 18 U. S. C. § 4205 (1976 ed.). To an unspecified degree,[7] the sentencing judge is obligated to make his decision on the

---

[6] The evolutionary development of sentencing and incarceration practices continues to engage attention. See S. 1437, 95th Cong., 1st Sess., Part III (1977); Task Force Report. Increasingly there are doubts concerning the validity of earlier, uncritical acceptance of the rehabilitation model. So experienced a penologist as the late Torsten Eriksson, long Director of Prisons in Sweden and later United Nations Interregional Advisor on Crime Prevention and Criminal Justice, dedicated his 1976 book, The Reformers: An Historical Survey of Pioneer Experiments in the Treatment of Criminals (Djurklou transl.), "[t]o those who tried, even if they failed."

[7] See Task Force Report 74:

"In the United States today, rehabilitative assumptions play some role in determining whether and for how long defendants have to be confined, but the precise weight given to such assumptions varies enormously among judges."

But to some of the most thoughtful and experienced correctional authorities, the optimistic predictions of earlier years on the efficacy of rehabilitation are undergoing reappraisal. See, *e. g.,* Eriksson, *supra,* n. 6.

basis, among others, of predictions regarding the convicted defendant's potential, or lack of potential, for rehabilitation.[8]

Indeterminate sentencing under the rehabilitation model presented sentencing judges with a serious practical problem: how rationally to make the required predictions so as to avoid capricious and arbitrary sentences, which the newly conferred and broad discretion placed within the realm of possibility. An obvious, although only partial, solution was to provide the judge with as much information as reasonably practical concerning the defendant's "character and propensities[,] . . . his present purposes and tendencies," *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937), and, indeed, "every aspect of [his] life." *Williams* v. *New York,* 337 U. S., at 250. Thus, most jurisdictions provided trained probation officers to conduct presentence investigations of the defendant's life and, on that basis, prepare a presentence report for the sentencing judge.[9]

---

[8] See Shimm, Foreword, 23 Law & Contemp. Prob. 399 (1958):

"Signalizing, on the one hand, the termination of the trial phase, sentencing must accurately reflect the community's attitude toward the misconduct of which the offender has been adjudged guilty, and thereby ratify and reinforce community values. Marking, on the other hand, the threshold of the sanction or treatment phase, however, and largely defining its character and length, sentencing must also look to the offender's rehabilitation, to his restoration as a functioning, productive, responsible member of the community."

[9] In 1945, Fed. Rule Crim. Proc. 32 (c) (2) provided, as it does today:

"The report of the presentence investigation shall contain any prior criminal record of the defendant and such information about his characteristics, his financial condition and the circumstances affecting his behavior as may be helpful in imposing sentence or in granting probation or in the correctional treatment of the defendant, and such other information as may be required by the court."

All amendments to Rule 32 (c) since its promulgation by this Court have had one of two purposes: first, to increase judicial use of presentence reports in the sentencing decision and, second, to assist the sentencing judge in assessing the accuracy of the information contained in them. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 32 and amend-

Constitutional challenges were leveled at judicial reliance on such information, however. In *Williams* v. *New York,* a jury convicted the defendant of murder but recommended a life sentence. The sentencing judge, partly on the basis of information not known to the jury but contained in a presentence report, imposed the death penalty. The defendant argued that this procedure deprived him of his federal constitutional right to confront and cross-examine those supplying information to the probation officer and, through him, to the sentencing judge. The Court rejected this argument. It noted that traditionally "a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Id.,* at 246. "And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge not be denied an opportunity to obtain pertinent information," *id.,* at 247; indeed, "[t]o deprive sentencing judges of this kind of information would undermine modern penological procedural policies that have been cautiously adopted throughout the nation after careful consideration and experimentation." *Id.,* at 249–250. Accordingly, the sentencing judge was held not to have acted unconstitutionally in considering either the defendant's participation in criminal conduct for which he had not been convicted or information secured by the probation investigator that the defendant was a "menace to society." See *id.,* at 244.

---

ments, 18 U. S. C. App., pp. 1456–1460 (1976 ed.); 8A J. Moore, Federal Practice ¶¶ 32.03 [1]–[4] (1975). To the same end, Congress, between 1973 and 1975, authorized 828 additional probation officers—an increase of more than 125%. The increase from 1971 to date has been more than 275%.

Title 18 U. S. C. §§ 4205 (c)–(d) (1976 ed.) provide district courts with a means, in addition to the presentence report, of acquiring information relevant to sentencing: commitment of the offender for up to six months to enable the Director of the Bureau of Prisons to make "a complete study . . . of the prisoner."

Of course, a sentencing judge is not limited to the often far-ranging material compiled in a presentence report. "[B]efore making [the sentencing] determination, a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States* v. *Tucker,* 404 U. S. 443, 446 (1972). Congress recently reaffirmed this fundamental sentencing principle by enacting 18 U. S. C. § 3577 (1976 ed.): [10]

> "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

Thus, we have acknowledged that a sentencing authority may legitimately consider the evidence heard during trial, as well as the demeanor of the accused. *Chaffin* v. *Stynchcombe,* 412 U. S. 17, 32 (1973). More to the point presented in this case, one serious study has concluded that the trial judge's "opportunity to observe the defendant, particularly if he chose to take the stand in his defense, can often provide useful insights into an appropriate disposition." ABA Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 5.1, p. 232 (App. Draft 1968).

A defendant's truthfulness or mendacity while testifying on his own behalf, almost without exception, has been deemed probative of his attitudes toward society and prospects for rehabilitation and hence relevant to sentencing. Soon after

---

[10] Title 18 U. S. C. § 3577 (1976 ed.) was enacted as a part of § 1001 of the Organized Crime Control Act of 1970, a section designed to impose extended terms of imprisonment on dangerous special offenders, *i. e.,* the habitual, professional, or organized crime offender. The House Report on the 1970 Act, by way of explanation of what is now § 3577, cites this Court's decision in *Williams* v. *New York.* H. R. Rep. No. 91–1549, p. 63 (1970); see also S. Rep. No. 91–617, p. 167 (1969).

*Williams* was decided, the Tenth Circuit concluded that "the attitude of a convicted defendant with respect to his willingness to commit a serious crime [perjury] . . . is a proper matter to consider in determining what sentence shall be imposed within the limitations fixed by statute." *Humes* v. *United States,* 186 F. 2d 875, 878 (1951). The Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits have since agreed. See n. 3, *supra.* Judge Marvin Frankel's analysis for the Second Circuit is persuasive:

> "The effort to appraise 'character' is, to be sure, a parlous one, and not necessarily an enterprise for which judges are notably equipped by prior training. Yet it is in our existing scheme of sentencing one clue to the rational exercise of discretion. If the notion of 'repentance' is out of fashion today, the fact remains that a manipulative defiance of the law is not a cheerful datum for the prognosis a sentencing judge undertakes. . . . Impressions about the individual being sentenced—the likelihood that he will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, the degree to which he does or does not deem himself at war with his society—are, for better or worse, central factors to be appraised under our theory of 'individualized' sentencing. The theory has its critics. While it lasts, however, a fact like the defendant's readiness to lie under oath before the judge who will sentence him would seem to be among the more precise and concrete of the available indicia." *United States* v. *Hendrix,* 505 F. 2d 1233, 1236 (1974).

Only one Circuit has directly rejected the probative value of the defendant's false testimony in his own defense. In *Scott* v. *United States,* 135 U. S. App. D. C. 377, 382, 419 F. 2d 264, 269 (1969), the court argued that

> "the peculiar pressures placed upon a defendant threatened with jail and the stigma of conviction make his

willingness to deny the crime an unpromising test of his prospects for rehabilitation if guilty. It is indeed unlikely that many men who commit serious offenses would balk on principle from lying in their own defense. The guilty man may quite sincerely repent his crime but yet, driven by the urge to remain free, may protest his innocence in a court of law."

See also *United States* v. *Moore,* 484 F. 2d 1284, 1288 (CA4 1973) (Craven, J., concurring). The *Scott* rationale rests not only on the realism of the psychological pressures on a defendant in the dock—which we can grant—but also on a deterministic view of human conduct that is inconsistent with the underlying precepts of our criminal justice system. A "universal and persistent" foundation stone in our system of law, and particularly in our approach to punishment, sentencing, and incarceration, is the "belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil." *Morissette* v. *United States,* 342 U. S. 246, 250 (1952). See also *Blocker* v. *United States,* 110 U. S. App. D. C. 41, 53, 288 F. 2d 853, 865 (1961) (opinion concurring in result). Given that long-accepted view of the "ability and duty of the normal individual to choose," we must conclude that the defendant's readiness to lie under oath—especially when, as here, the trial court finds the lie to be flagrant—may be deemed probative of his prospects for rehabilitation.

## III

Against this background we evaluate Grayson's constitutional argument that the District Court's sentence constitutes punishment for the crime of perjury for which he has not been indicted, tried, or convicted by due process. A second argument is that permitting consideration of perjury will "chill" defendants from exercising their right to testify on their own behalf.

## A

In his due process argument, Grayson does not contend directly that the District Court had an impermissible purpose in considering his perjury and selecting the sentence. Rather, he argues that this Court, in order to preserve due process rights, not only must prohibit the impermissible sentencing practice of incarcerating for the purpose of saving the Government the burden of bringing a separate and subsequent perjury prosecution but also must prohibit the otherwise *permissible* practice of considering a defendant's untruthfulness for the purpose of illuminating his need for rehabilitation and society's need for protection. He presents two interrelated reasons. The effect of both permissible and impermissible sentencing practices may be the same: additional time in prison. Further, it is virtually impossible, he contends, to identify and establish the impermissible practice. We find these reasons insufficient justification for prohibiting what the Court and the Congress have declared appropriate judicial conduct.

First, the evolutionary history of sentencing, set out in Part II, demonstrates that it is proper—indeed, even necessary for the rational exercise of discretion—to consider the defendant's whole person and personality, as manifested by his conduct at trial and his testimony under oath, for whatever light those may shed on the sentencing decision. The "parlous" effort to appraise "character," *United States* v. *Hendrix, supra,* at 1236, degenerates into a game of chance to the extent that a sentencing judge is deprived of relevant information concerning "every aspect of a defendant's life." *Williams* v. *New York,* 337 U. S., at 250. The Government's interest, as well as the offender's, in avoiding irrationality is of the highest order. That interest more than justifies the risk that Grayson asserts is present when a sentencing judge considers a defendant's untruthfulness under oath.

Second, in our view, *Williams* fully supports consideration

of such conduct in sentencing. There the Court permitted the sentencing judge to consider the offender's history of prior antisocial conduct, including burglaries for which he had not been duly convicted. This it did despite the risk that the judge might use his knowledge of the offender's prior crimes for an improper purpose.

Third, the efficacy of Grayson's suggested "exclusionary rule" is open to serious doubt. No rule of law, even one garbed in constitutional terms, can prevent improper use of firsthand observations of perjury. The integrity of the judges, and their fidelity to their oaths of office, necessarily provide the only, and in our view adequate, assurance against that.

## B

Grayson's argument that judicial consideration of his conduct at trial impermissibly "chills" a defendant's statutory right, 18 U. S. C. § 3481 (1976 ed.), and perhaps a constitutional right to testify on his own behalf is without basis. The right guaranteed by law to a defendant is narrowly the right to testify truthfully in accordance with the oath—unless we are to say that the oath is mere ritual without meaning. This view of the right involved is confirmed by the unquestioned constitutionality of perjury statutes, which punish those who willfully give false testimony. See, e. g., 18 U. S. C. § 1621 (1976 ed.); cf. *United States* v. *Wong,* 431 U. S. 174 (1977). Further support for this is found in an important limitation on a defendant's right to the assistance of counsel: Counsel ethically cannot assist his client in presenting what the attorney has reason to believe is false testimony. See *Holloway* v. *Arkansas,* 435 U. S. 475, 480 n. 4 (1978); ABA Project on Standards for Criminal Justice, The Defense Function § 7.7 (c), p. 133 (Compilation 1974). Assuming, *arguendo,* that the sentencing judge's consideration of defendants' untruthfulness in testifying has any chilling effect on a defendant's decision to testify falsely, that effect is entirely permissible. There is no protected right to commit perjury.

Grayson's further argument that the sentencing practice challenged here will inhibit exercise of the right to testify truthfully is entirely frivolous. That argument misapprehends the nature and scope of the practice we find permissible. Nothing we say today requires a sentencing judge to enhance, in some wooden or reflex fashion, the sentences of all defendants whose testimony is deemed false. Rather, we are reaffirming the authority of a sentencing judge to evaluate carefully a defendant's testimony on the stand, determine— with a consciousness of the frailty of human judgment— whether that testimony contained willful and material falsehoods, and, if so, assess in light of all the other knowledge gained about the defendant the meaning of that conduct with respect to his prospects for rehabilitation and restoration to a useful place in society. Awareness of such a process realistically cannot be deemed to affect the decision of an accused but unconvicted defendant to testify truthfully in his own behalf.

Accordingly, we reverse the judgment of the Court of Appeals and remand for reinstatement of the sentence of the District Court.

*Reversed and remanded.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

The Court begins its consideration of this case, *ante,* at 42, with the assumption that the respondent gave false testimony at his trial. But there has been no determination that his testimony was false. This respondent was given a greater sentence than he would otherwise have received—how much greater we have no way of knowing—solely because a single judge *thought* that he had not testified truthfully.[1] In es-

---

[1] We know this only because of the trial judge's laudable explication of his reasons for imposing the sentence in this case. In many cases it would be impossible to discern whether a sentencing judge had been influenced by

sence, the Court holds today that *whenever* a defendant testifies in his own behalf and is found guilty, he opens himself to the possibility of an enhanced sentence. Such a sentence is nothing more or less than a penalty imposed on the defendant's exercise of his constitutional and statutory rights to plead not guilty and to testify in his own behalf.[2]

It does not change matters to say that the enhanced sentence merely reflects the defendant's "prospects for rehabilitation" rather than an additional punishment for testifying falsely.[3] The fact remains that all defendants who choose to testify, and only those who do so, face the very real pros-

---

his belief that the defendant had not testified truthfully, since there is no requirement that reasons be given. But that fact does not argue against correcting an erroneous sentencing policy that is apparent on the face of the record. Cf. *Bordenkircher* v. *Hayes*, 434 U. S. 357, 372 (POWELL, J., dissenting). As the Court notes, *ante*, at 54, "[t]he integrity of the judges" is a sufficient guarantee that they will not consciously consider factors that have been declared impermissible, even if the reasons for imposing a particular sentence are not stated on the record.

[2] The accused in a federal case has an absolute constitutional right to plead not guilty, and if he does elect to go to trial an absolute statutory right to testify in his own behalf. 18 U. S. C. § 3481 (1976 ed.). I cannot believe that the latter is not also a constitutional right, for the right of a defendant under the Sixth and Fourteenth Amendments "to make his defense," *Faretta* v. *California*, 422 U. S. 806, 819, surely must encompass the right to testify in his own behalf. See *Ferguson* v. *Georgia*, 365 U. S. 570, 602 (Clark, J., concurring).

[3] Indeed, without doubting the sincerity of trial judges one may doubt whether the single incident of a defendant's trial testimony could ever alter the assessment of rehabilitative prospects so drastically as to justify a perceptibly greater sentence. A sentencing judge has before him a presentence report, compiled by trained personnel, that is designed to paint as complete a picture of the defendant's life and character as is possible. If the defendant's suspected perjury is consistent with the evaluation of the report, its impact on the rehabilitative assessment must be minimal. If, on the other hand, it suggests such a markedly different character that different sentencing treatment seems appropriate, the defendant is *effectively* being punished for perjury without even the barest rudiments of due process.

pect of a greater sentence based upon the trial judge's un-reviewable perception that the testimony was untruthful. The Court prescribes no limitations or safeguards to minimize a defendant's rational fear that his truthful testimony will be perceived as false.[4] Indeed, encumbrance of the sentencing process with the collateral inquiries necessary to provide such assurance would be both pragmatically unworkable and theo-retically inconsistent with the assumption that the trial judge is merely considering one more piece of information in his overall evaluation of the defendant's prospects for rehabilita-tion. But without such safeguards I fail to see how the Court can dismiss as "frivolous" the argument that this sentencing practice will "inhibit exercise of the right to testify truth-fully," *ante,* at 55.

A defendant's decision to testify may be inhibited by a number of considerations, such as the possibility that damag-ing evidence not otherwise admissible will be admitted to impeach his credibility. These constraints arise solely from the fact that the defendant is quite properly treated like any other witness who testifies at trial. But the practice that the Court approves today actually places the defendant at a disadvantage, as compared with any other witness at trial, simply because he is the defendant. Other witnesses risk

---

[4] For example, the dissenting judge in the Court of Appeals in this case suggested that a sentencing judge "should consider his independent evalua-tion of the testimony and behavior of the defendant only when he is convinced beyond a reasonable doubt that the defendant intentionally lied on material issues of fact . . . [and] the falsity of the defendant's testi-mony [is] necessarily established by the finding of guilt." 550 F. 2d 103, 114 (Rosenn, J., dissenting). Contrary to Judge Rosenn, I do not believe that the latter requirement was met in this case. The jury could have believed Grayson's entire story but concluded, in the words of the trial judge's instructions on the defense of duress, that "an ordinary man" would *not* "have felt it necessary to leave the Allenwood Prison Camp when faced with the same degree of compulsion, coercion or duress as the Defendant was faced with in this case."

.

punishment for perjury only upon indictment and conviction in accord with the full protections of the Constitution. Only the defendant himself, whose testimony is likely to be of critical importance to his defense,[5] faces the additional risk that the disbelief of a single listener will itself result in time in prison.

The minimal contribution that the defendant's possibly untruthful testimony might make to an overall assessment of his potential for rehabilitation, see n. 3, *supra,* cannot justify imposing this additional burden on his right to testify in his own behalf. I do not believe that a sentencing judge's discretion to consider a wide range of information in arriving at an appropriate sentence, *Williams* v. *New York,* 337 U. S. 241, allows him to mete out additional punishment to the defendant simply because of his personal belief that the defendant did not testify truthfully at the trial.

Accordingly, I would affirm the judgment of the Court of Appeals.

---

[5] Notwithstanding the standard instruction that the jury is not to draw any adverse inference from the defendant's failure to testify, "a defendant who does not take the stand will probably fatally prejudice his chances of acquittal." Note, The Influence of the Defendant's Plea on Judicial Determination of Sentence, 66 Yale L. J. 204, 212 n. 36 (1956).