People v Armeli (2025 NY Slip Op 25099)

[*1]

People v Armeli

2025 NY Slip Op 25099

Decided on April 15, 2025

Justice Court Of The Town Of Orchard Park, Erie County

Pastrick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on April 15, 2025
Justice Court of the Town of Orchard Park, Erie County

The People of the State of New York,

against
Christopher R. Armeli, Defendant.

Docket No. 23090240

For the People:
Nathan Zobrest, Esq.
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, New York 14202
For defendant:
Kevin R. Shelby, Esq.
5662 Main Street
Williamsville, New York 14221

Michael J. Pastrick, J.

By verdict rendered March 7, 2025, defendant was convicted, after a nonjury trial, of one count of aggravated harassment in the second degree (Penal Law § 240.30 [2]) relative to an episode in which he telephoned the Orchard Park Police Department repeatedly and without legitimate reason over a period of several hours with intent to harass another person. Following that conviction, defendant has continued to engage in harassing and bullying behavior, as well as in efforts that may be fairly characterized as attempts to intimidate and threaten. 
Now, for the reasons that follow, pursuant to CPL 530.45 (2-a) this court revokes the securing order rendered prior to the conviction and issues a new securing order remanding defendant to the custody of the Erie County Sheriff pending imposition of sentence. I.
The unique circumstances of this case demand a unique approach. Here this court's review begins with reference to what eventually will become the sentencing phase of this matter.
Sentencing, courts have long recognized, is accomplished outside "the mold of trial procedure" (Williams v State of NY, 337 US 241, 251 [1949]), such that "the view of the sentencing judge [is not restricted] to the information received in open court" (id.; see id. at 250). Indeed, courts in this country have historically followed the "fundamental sentencing principle" (Roberts v U.S., 445 US 552, 556 [1980] [internal quotation marks omitted]) allowing "a sentencing judge [to] exercise wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed" (Williams, 337 US at [*2]246; see United States v Grayson, 438 US 41, 49-50 [1978]) while mindful of the modern penological philosophy "that the punishment should fit the offender and not merely the crime" (Williams, 337 US at 247) and within "limits fixed by law" (id. at 246). 
The tailoring of the punishment to the offender is accomplished in many instances with the assistance of a report prepared by "trained probation officers" following an "investigation of the defendant's life" (Grayson, 438 US at 48), "habits" (Williams, 337 US at 247), "background[]" (Williams, 337 US at 246), and reputation (see People v Williams, 219 AD3d 409, 409 [1st Dept 2023]). A sentencing court may also consider, among other things, a defendant's "demeanor" (Grayson, 438 US at 50), "personality[]" (Williams, 337 US at 246), and criminal and social history (CPL 390.30 [1]), as well as the defendant's "attitudes toward society and prospects for rehabilitation" (Grayson, 438 US at 50), which may be revealed by their "truthfulness or mendacity while testifying on [their] own behalf" (id.).
All of those factors, and "any other matter which the [Erie County Probation Department] deems relevant to the question of sentence," may be included in the pre-sentence report previously ordered, and presently awaited, by this Court (CPL 390.30 [1]; see Executive Law § 256 [1]). 

II.

In view the absence of the pre-sentence report, and in view of the limitations on penalty options absent receipt of such a report (see CPL 390.20 [2] [a], [b]), this matter is not yet ripe for imposition of sentence. It is, however, at a point where a personal appearance of defendant was needed, and at which additional action of this court has been required. 

A.

By way of background, defendant was charged with one count of aggravated harassment in the second degree (Penal Law § 240.30 [2]) pursuant to an accusatory instrument filed on or about September 29, 2023. That instrument specifies that
"Defendant did yell, scream, and use obscene language toward [a certain Officer of the Orchard Park Police Department] and the Dispatchers answering the calls. The defendant was told stop calling the Police Department unless he had a legitimate reason or an emergency[, and he] refused to cease his calls."
Defendant was arraigned on that charge on October 3, 2023 and, at the conclusion of that proceeding, was released under supervision (RUS) pursuant to an order issued by this court. What this court will characterize as the RUS order required, among other things, that defendant
"[c]ooperate with any Alcohol, Substance Abuse, or Mental Health Evaluation as directed by the Probation Department, and comply with any treatment recommended."
In addition to those standard conditions, the same paper directed that defendant "not telephone Orchard Park dispatch unless it is an emergency." Release under supervision, and the attendant standard and non-standard conditions imposed by the court, were and are authorized by article 510 of the Criminal Procedure Law (see CPL 510.10 [3]; CPL 510.10 [3-a] [a]; and CPL 510.10 [3-a] [d]; see also William C. Donnino, Supp Practice Commentaries, McKinney's Cons Law of NY, CPL 500.10). At the time those conditions were imposed, the court was intentionally inarticulate in its explanation for the imposition of RUS so as to avoid embarrassing defendant and to limit the risk of chilling defendant's openness to involvement in pre-trial services that the court thought might be germane to him. 

B.

On or about December 18, 2023, defendant had either delivered or caused to be delivered to this court a "Notice of Claim" in which he expressed his "intent to file claim against the Town of Orchard Park, the Orchard Park Police Department, [this court], and [Orchard Park Police Chief] Patrick Fitzgerald for 50 Million Dollars plus exemplary damages resulting from actions" that defendant alleged were discovered on December 14, 2023. Defendant specifically contended that RUS was not authorized by the Criminal Procedure Law in the context of this case; that the court lacked jurisdiction over defendant; and that the court conspired with the Orchard Park Police Chief to violate the First, Fourth, and Fifth Amendments of the federal constitution, as well as the Americans with Disabilities Act. That "conspiracy," as best the court can discern, relates to what defendant characterized as a plot to require, when defendant contacts the Orchard Park Police Department for non-emergency reasons, him to personally appear in a way that would trigger a post-traumatic stress disorder traceable to, among other things, what defendant referred to as an incident in which he was violently assaulted by law enforcement officers of and in a different state. 

C.

The court addressed those allegations, insofar as they pertain to this case, at an appearance held on January 16, 2024. Those claims, the court then believed, could be construed as an effort to induce its recusal from this matter. 
To that end, at that appearance, the court recounted what then was the history of this matter, addressed the legality of RUS in this context and, in view of the allegations made in the notice of claim, spoke to the social concerns coincident with the RUS order. Specifically, and in view of potential changes to the landscape of this matter occasioned by the notice of claim, the court noted various physical issues that, taken in conjunction with the nature allegations against him, caused the court to wonder whether defendant might have treatment needs that could have been facilitated by the release under supervision program. 
The court added that it had hoped that any such needs "would be addressed in a confidential manner" under CPL 500.10 (c) and (d), and that it had previously alluded to such concerns "in an inarticulate fashion so as to avoid an outcome in which defendant felt mocked by [the court's] observations, or angered, or tepidly approached such pre-trial intervention."[FN1]
Indeed, the court added, it "was concerned that defendant might decline to meaningfully engage in or cooperate with such interventive efforts," which "might [have] dictate[d] whether defendant should be steered toward a treatment court, or might guide the court with respect to the issue whether defendant is an incapacitated person should be entered."[FN2]

The court also reiterated that defendant had made three appearances following entry of the securing and RUS orders before denying what it then perceived as the request to recuse itself from this matter. Defendant, the court adds, did not seek reduction of RUS to release on recognizance until what the court recalls was a November 2024 appearance.

***

At the November 20204 appearance, given the length of defendant's RUS and his record of attending scheduled court appearances, the court released defendant on recognizance, subject to the oral condition that he continue to refrain from telephoning the Orchard Park Police Department for non-emergency reasons. Defendant did not object to that condition, and he similarly did not voice any concern remotely similar to those expressed in the notice of claim that he tendered to this court. 
To the court's understanding, defendant also did not, at any time relevant to this matter, seek review of the subject securing order by a superior court judge (see CPL 530.30 [1] [d]). Moreover, to the court's further understanding, defendant has not commenced an action seeking damages or a proceeding seeking equitable relief relative to the allegations advanced in the notice of claim. 

D.

The notice of claim was not defendant's only communication to this court during the pendency of this matter. To the court's recollection, defendant, either directly or through non-attorney proxy, has directed either to the court or a witness against him communication that a reasonable mind might view on a spectrum of, at best, agitating to, at worst, threatening on at least 12 other occasions. 

1.

On or about October 10, 2023, defendant left a lengthy voicemail with this court relative to what he characterized as "a civil case pending out of Buffalo City Court" against the Town of Orchard Park and the Orchard Park Police Department officer who attested to the complaint against him in this criminal proceeding for what defendant suggested were damages arising from "the destruction of . . . evidence and other documents also." In that message, defendant contended that such civil proceeding catalyzed this criminal matter as an effort to "retaliat[e] against [him]." 
Aside from that voicemail and the notice of claim, no further communication was received from defendant before the nonjury trial began on November 19, 2024. That proceeding continued over two additional dates—December 18, 2024 and February 13, 2025—before the court eventually returned a verdict convicting defendant of the single count of aggravated harassment in the second degree (Penal Law § 240.30 [2]) with which he was charged on March 7, 2025. In the meantime, and during trial, communication by and apparently on behalf of defendant with the court began anew.

2.

On December 16, 2024—that is, two days before his nonjury trial was to resume—defendant's husband wrote the court, in his capacity as "Director of Marketing and Strategic Planning" for the "National Centers for Advocacy and Justice" (NCAJ), for what he contended was the purpose of "offer[ing] more context" relative to an October 8, 2024 order of this court (see People v Armeli, 84 Misc 3d 1210[A] [Orchard Park Town Court 2024]). That order, in relevant part, denied the request of the NCAJ for "permission to videotape and privately audiotape . . . the nonjury trial . . . for the purpose of later broadcast and publication." The application giving rise to that order noted that defendant is the "Executive Director" of the NCAJ, and defendant otherwise styles himself as the "President/Founder" of that organization (see https://nationalcentersforadvocacyandjustice.com/about-us [last accessed April 15, 2025]). 
In the December 16, 2024 letter, which was sent on NCAJ letterhead and signed by defendant's husband in his capacity as NCAJ's "director of marketing and strategic planning," the NCAJ explained that " '[o]ur' main concern is how the court feels about these decisions in light of the CEO shooting in NYC" and wondered "how the court feels about setting precedent that justice will not be served through non-violent means" (emphases added). The NCAJ then inquired, "[w]hat does the court believe will eventually happen if the public sees cases like this and decides the only way to get justice is to engage in vigilantism?" (emphasis added). The NCAJ continued to note that "we would like the court's opinion on how promoting th[e] [allegedly] baseless charges [against defendant] does not incite future violence in the form of vigilantism as seen in NYC" before referencing "the current love for a vigilante murder by most of the population" (emphases added). 
The court notes that, inasmuch as this submission was received in the midst of the nonjury trial, it immediately forwarded that letter to counsels and did not review that correspondence until after rendering the verdict in this case. The court also notes that, in its view, there was no legitimate reason to allude to what it understands to be the notorious and public assassination of a United Health Care executive in the context of this case. The court adds only that a reasonable mind easily could construe the repeated references to violence and the multiple allusions to what appears to have been a prominent, symbolic, and targeted assassination of a person responsible for making unpopular decisions as a threat to either or both of the court and those who brought the instant charge against defendant. 

3-4.

On or about March 10, 2025—that is, three days after he was convicted—defendant left two voicemails with the court's clerk alleging, in sum and substance, that a court clerk had destroyed "evidence" in the form of what the court vaguely understands to be a criminal complaint that defendant claims to have filed in a separate matter. Defendant, in those messages, indicated that he was represented by counsel other than defense counsel relative to that matter, and that he had a copy of the subject filing, which he described as containing a raised seal. 
No written support for this contention was made, no contact from counsel has been received relative to this issue, and no copy of the document purportedly containing the raised seal (which the court notes is applied only to documents leaving the court to establish the authenticity of those court-generated instruments) has been furnished for this court's review. The court initially scheduled this appearance for the purpose of allowing defendant—who remains the subject of a proceeding before this court and who claims to be represented by counsel with respect to the issue raised via telephone on or about March 10, 2025—to [*3]communicate any continuing concern he might have relative to this point on the record. 
5.
On or about March 10, 2025, defendant also tendered to the court what he styled as a press release reflecting, as relevant here, his contention that "[i]t has come to [his] attention that the [court] has been involved in controversies related to organizations such as the Proud Boys and the Westboro Baptist Church." Defendant amplified that claim by raising the specious contention that such "affiliations raise serious concerns about his commitment to the values we hold dear as a community" (emphasis added). 
No support has been offered relative to the absurd and specious allegations that the court is affiliated or in any way even remotely connected to such organizations or ideology. 

6.

On or about March 24, 2025, defendant tendered an email to, among others, this court and certain media outlets in which defendant asserted various claims of bias against the court before making a gratuitous reference to actor and rapper Ice-T. The court notes that such performer has no relevance to or connection with this matter. The court also recalls, however, that such performer gained notoriety in the early 1990s through his release of a song entitled, "Cop Killer." 
No support has been offered relative to defendant's claims of bias on the part of the court. Similarly, defendant has not moved for the recusal of this court from this matter based on those claims. 

7.

On March 25, 2025, defendant filed with this court a small claims proceeding in which he sought $14.95 in damages relative to an incident in which a person whom the trial evidence reflects is defendant's stepfather allegedly, "multiple times over the last year[,] promised payment for razors [and] gas to drive to Home Depot in order to 'kill myself.' " Defendant further alleged that his father-in-law "has not yet fulfilled the contract," which defendant characterized as "in writing [and] verified by multiple witnesses."
The trial evidence, to the court's recollection, reflects that defendant's father-in-law resides in Colorado. Defendant, however, identified a local address for that defendant. One of the court's clerks subsequently alerted the court to the fact that such local address belongs to a law enforcement witness who testified against him at trial.

8.

On April 7, 2025, defendant emailed the court to complain that the court's clerk had attempted to "entrap [him] into not appearing for something because [the court] lied about [his] address to Erie County probation." In that email, defendant also indicated that he is "a Colorado resident, [and] ha[s] been for over 6 months."Defendant also identified his "legal address" as being at a location certain in Colorado, asserted his Fifth Amendment right against self-incrimination, and contended that he "was already threatened by the defendant [sic] after he had ex-parte communication with me and lied at the Orchard Park Fire Department." Defendant then complained that "[y]ou guys have already intimidated me in this case on behalf of the Orchard Park Police Department threatening [my] testimony," which defendant subsequently characterized as having been "tampered with."
None of the complaints articulated in that email has been the subject of a motion for post-trial and pre-sentencing relief. The statement in that email with respect to defendant's "legal address" being in Colorado for the preceding six months also conflicts with the articulation of [*4]defendant's address in the March 2025 small claims proceeding. In that proceeding, which was filed approximately two weeks before he tendered the instant email, defendant represented to the court that he has a certain Orchard Park, New York address.

9.

April 7, 2025 also saw defendant submit a second email to the court. In that latter submission, defendant, among other things, complained that "[t]he last time [he] didn't do something that a police officer or the district attorney told [him] to, [he] was convicted of [aggravated] harassment in the second degree for asking for help." Defendant further speculated that, should he "come back to New York," he "risk[ed] getting charged with another crime according to the DA's office." 
Defendant did not, however, offer any support for those assertions.

10-12.

Finally, on April 10, 2025, defendant sent three emails to the court.
In the first of those emails, sent at 6:38 p.m. to a list of recipients including the court, a county employee, and the New York State Attorney General, defendant complained that "threats have been made by or on behalf of his husband's family" referencing his "return to Orchard Park." Defendant appeared to further contend that the District Attorney and the court "made it clear that our lives are not protected in Orchard Park." Defendant added that "[t]he court needs to put an end to this" before suggesting that "the [court] is on [the] payroll" of defendant's father-in-law. 
No support was offered for any of those claims.

***

In the second of those emails, sent at 7:06 p.m. to recipients including the court, the New York State Attorney General, and various media outlets, defendant contended that he was in Colorado, that he was "afraid" to return to Orchard Park, and that various local law enforcement agencies and prosecutors had "chosen to overlook crimes committed against [defendant and his husband] because [they] are LGBTQ." 
No support was offered for any of those claims. The court adds that defendant's contention with respect to his presence in Colorado appears to conflict with the representation made in defendant's March 24, 2025 email, which is described in section II.C.6 of this writing and in which defendant indicated that he would "be in Hawaii until the 14th of April."

***

In the third email sent on April 10, defendant, among other things, complained that he had been threatened by an unidentified person via text message. Defendant offered a "$100,000 [reward for] the arrest and conviction of anyone who sent [that] text to [him]." Defendant also offered a monetary reward for evidence of corruption on the part of the prosecutor's office and the law enforcement agency relevant to this matter.[FN3]

Neither support nor basis was offered for any of defendant's claims with respect to corruption. 

III.

The court now returns to the principles articulated in conjunction with its discussion of what will be the sentencing phase of this matter.
Relevant to the penalty imposed by a sentencing court are factors that include, among other things, a defendant's demeanor, criminal and social history, truthfulness, attitudes toward society, and prospects for rehabilitation (see Grayson, 438 US at 50; see also CPL 390.30 [1]). Defendant stands convicted of a crime involving the harassment of an officer and dispatchers of the Orchard Park Police Department in an incident in which he flooded "the Orchard Park Police Department's landline 62 times and the 911 line 5 times" in a period of approximately 3½ hours. In none of those calls did defendant, a self-styled "legal consultant," seek to report an emergency, and that series of calls appeared to be catalyzed by defendant's request for non-exigent information relative to the address of a police employee. 
Although that information is protected under the Freedom of Information Law (see Public Officers Law § 89 [2-b] [b]), defendant quickly escalated to yelling and swearing at the dispatcher who took his call. A series of hang-up calls ensued, after which defendant, to the court's recollection, joked that he had to "go piss more cops off." Defendant then continued with additional, nonsensical calls in which he screamed at those who answered the phone and asserted that his behavior was protected free speech. Inasmuch as the part of the penal law under which defendant was eventually convicted (§ 240.30 [2]), however, "proscribes only conduct and expressly removes from its application 'legitimate communication,' [a] defendant may not invoke the First Amendment or [the corollary state constitutional provision] to support a challenge to the facial validity of that statute" (People v Shack, 86 NY2d 529, 535 [1995] [emphases added]). Indeed, the court notes,
"[c]onstitutional free speech protections have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses; a person's right to free expression may be curtailed upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. [And,] [a]n individual's right to communicate must be balanced against the recipient's right 'to be let alone' in places in which the latter possesses a right of privacy, or places where it is impractical for an unwilling listener to avoid exposure to the objectionable communication" (id. at 535-536 [internal citations and quotation marks omitted]). A police department dispatch center is one of those locations. To this Court's understanding, publicly available information reflects that the dispatch center at issue is the initial point of contact for over 2,000 service calls per year, which range from the mundane to life-threatening situations. And yet defendant persisted on the night in question with his efforts to "piss . . . off" those who field those service calls by making dozens more calls involving screaming, unfounded hysteria, behavior that is fairly described as pedantic and antagonistic, and incessant, unnecessary complaining about police efforts to diffuse the situation by directing defendant to file a complaint in person. 

***

That pattern of behavior continues through the present time. Defendant, through correspondence and other communication noted in this writing, continues to engage in efforts to intimidate, to bully, and to threaten. Those efforts—and defendant's concomitant poor [*5]demeanor, poor attitude, apparent difficult relationship with the truth, and shifting articulation of his whereabouts and willingness to return for further proceedings—have succeeded only in alerting the court to his poor prospects for rehabilitation and in convincing it that a sentence of incarceration is necessary in this matter. 
Consequently, consistent with CPL 530.45 (2-a), the court revokes the prior securing order and remands defendant to the custody of the Erie County Sheriff pending completion of the presentence report, which the court notes may be a predicate to sentencing (see CPL 390.20 [2] [a], [b]).[FN4]
Defendant shall return for sentencing at a date and time to be set by the court and, in any event, no later than June 12, 2025. 
Dated: April 15, 2025
Hon. Michael J. Pastrick

Footnotes

Footnote 1:In that vein, the court notes that it specifically and intentionally avoided mentioning what are fairly characterized as shocking allegations of long-ago trauma referenced in the notice of claim (see Civil Rights Law § 50-b [1]).

Footnote 2:At the same appearance, the court noted that the determination to release defendant under supervision was made upon consideration of the charge facing defendant (see CPL 510.10 [1] [b]) and defendant's criminal conviction record (see CPL 510.10 [1] [c]). The court also considered the potential public harm in the charge facing defendant, manly, that such activity could result in the inundation of the Orchard Park Police Department's non-emergency lines and lead to the inability of the dispatch center of the Town of Orchard Park to respond to a genuine emergency. That concern, the court further noted, caused it to craft a narrow directive designed to lend additional protection and safeguard to all involved that simply precluded defendant from, as noted, "telephon[ing] Orchard Park dispatch unless it is an emergency."

Footnote 3:All of the materials referenced herein, save for the October 2023 voicemail, were forwarded to the parties upon receipt. Once the court recognized the relevance the October 2023 voicemail to the instant release determination and potentially to sentencing, that recording, too, was immediately forwarded to the parties.

Footnote 4:In doing so, the court notes its disagreement with the contention of the supplementary practice commentaries with respect to CPL 530.45 presuming that, in the context of this conviction of a nonqualifying offense, the court's "securing order [are] limited [by CPL 510.10]" (William C. Donnino, Supplementary Practice Commentaries, McKinney's Cons Law of NY, CPL 530.45). That presumption overlooks the use of the word "notwithstanding" in CPL 530.45 (2-a), which excepts the provisions of CPL 510.10 (4) from consideration following conviction of an offense of this nature (see generally CNH Diversified Opportunities Master Account, L.P. v Cleveland Unlimited, Inc., 36 NY3d 1, 16 [2020], rearg denied 36 NY3d 1043 [2021] ["the use of ... a 'notwithstanding' clause clearly signals the drafter's intention that the provision of the 'notwithstanding' section override conflicting provisions of any other section"] [internal quotation marks omitted]).