People v Armeli (2025 NY Slip Op 51016(U))

[*1]

People v Armeli

2025 NY Slip Op 51016(U)

Decided on June 12, 2025

Justice Court Of The Town Of Orchard Park, Erie County

Pastrick, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 12, 2025
Justice Court of the Town of Orchard Park, Erie County

The People of the State of New York,

against
Christopher R. Armeli, Defendant.

Docket No. 23090240

For the People:
Nathan Zobrest, Esq.
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, New York 14202
For defendant:
Kevin R. Shelby, Esq.
5662 Main Street
Williamsville, New York 14221

Michael J. Pastrick, J.

By verdict rendered March 7, 2025, defendant was convicted, after a nonjury trial, of one count of aggravated harassment in the second degree (Penal Law § 240.30 [2]) relative to an episode in which he telephoned the Orchard Park Police Department repeatedly and without legitimate reason over a period of several hours with intent to harass another person. Approximately five weeks after that conviction, defendant's continuing engagement in harassing and bullying behavior caused the court to issue a written decision revoking the prior securing order and remanding him to the custody of the Erie County Sheriff pending imposition of sentence (see CPL 530.40 [2-a]; People v Armeli, ___ Misc 3d ___, 2025 NY Slip Op 25099 [Justice Court, Orchard Park, April 15, 2025]). 
Now, the court writes to explain the sentence imposed with respect to this conviction. Inasmuch as a court cannot feel guilty about protecting the innocent, this body now imposes what it believes to be the most significant penalty rendered relative to a matter of this nature. To deter those similarly inclined to selfishly disrupt potentially life-saving services directed by operators at a public safety answering point, and to prevent similar such disruptions by defendant in the future, this court sentences defendant to what in this context is the maximum period of sixty days' incarceration, the maximum period of three years' probation (subject to general and special conditions outlined and agreed to by defendant at the sentencing hearing), and imposes [*2]the maximum fine of $1,000.[FN1]
I.

 A.
The relevant facts were detailed in a prior order (Armeli, ___ Misc 3d at ___, 2025 NY Slip Op at *1-6). Briefly, defendant was charged with and convicted of one count of aggravated harassment in the second degree (Penal Law § 240.30 [2]) following an incident in which he flooded "the Orchard Park Police Department's landline [with] 62 [calls] and the 911 line [with five calls]" in a period of approximately 3½ hours. In none of those calls did defendant, a self-styled "legal consultant," seek to report an emergency, and that series of calls appeared to be catalyzed by defendant's request for non-exigent information relative to the address of a police employee.
Although that information is protected under the Freedom of Information Law (see Public Officers Law § 89 [2-b] [b]), defendant quickly escalated to yelling and swearing at the dispatcher who answered his calls. Although he was instructed to stop telephoning that department, a series of hang-up calls ensued, after which defendant, to the court's recollection, joked that he had to "go piss more cops off." Defendant then continued with additional, nonsensical calls in which he screamed at those who answered the phone and asserted that his behavior was protected free speech. 
As an aside, the court notes that, inasmuch as the part of the penal law under which defendant was eventually convicted (Penal Law § 240.30 [2]) "proscribes only conduct and expressly removes from its application 'legitimate communication,' [a] defendant may not invoke the First Amendment or [the corollary state constitutional provision] to support a challenge to the facial validity of that statute" (People v Shack, 86 NY2d 529, 535 [1995] [emphases added]). Indeed, the court adds,
"[c]onstitutional free speech protections have never been thought to give absolute protection to every individual to speak whenever or wherever he pleases, or to use any form of address in any circumstances that he chooses; a person's right to free expression may be curtailed upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. [And,] [a]n individual's right to communicate must be balanced against the recipient's right 'to be let alone' in places in which the latter possesses a right of privacy, or places where it is impractical for an unwilling listener to avoid exposure to the objectionable communication" (id. at 535-536 [internal citations and quotation marks omitted]).

 B.
A police department dispatch center is one of those locations. To this court's understanding, publicly available information reflects that the center at issue is the initial point of contact for thousands of service calls per year, which range from the mundane to life-threatening situations. And yet defendant persisted on the night in question with his efforts to [*3]"piss . . . off" those who field those service requests by making dozens more calls involving screaming, unfounded hysteria, behavior that is fairly described as petulant and antagonistic, and incessant, unnecessary complaining about police efforts to diffuse the situation by directing him to file a complaint in person.

C.
That behavior continued after defendant was charged and before this court ultimately rendered sentence. During the nonjury trial, which was conducted over a period of three days between November 2024 and February 2025, an organization of which defendant is the "President/Founder" sent to this court a letter referring to the notorious and public assassination of a United Health Care executive and suggesting that this matter could incite similar "vigilantism" here (see Armeli, ___ Misc 3d at ___, 2025 NY Slip Op 25099, at **4-5). Then, after trial, defendant engaged in a pattern of antagonistic and, by his own admission, "intimidating" behavior directed toward the court, its staff, and at least one complainant in this matter. All that conduct is detailed in a prior decision issued in this matter (see id. ___, **4-7), and all that conduct precipitated the court's prior remand of defendant to the custody of the Erie County Sheriff in advance of sentencing (see id. at ___, **1, 8). 
Against that backdrop, the court now turns to the task of imposing punishment. 

II.

 A.
Sentencing, courts have long recognized, is accomplished outside "the mold of trial procedure" (Williams v State of NY, 337 US 241, 251 [1949]), such that "the view of the sentencing judge [is not restricted] to the information received in open court" (id.; see id. at 250). Indeed, courts in this country have historically followed the "fundamental sentencing principle" (Roberts v U.S., 445 US 552, 556 [1980] [internal quotation marks omitted]) allowing "a sentencing judge [to] exercise wide discretion in the sources and types of evidence used to assist [them] in determining the kind and extent of punishment to be imposed" (Williams, 337 US at 246 see United States v Grayson, 438 US 41, 49-50 [1978]) while mindful of the modern penological philosophy "that the punishment should fit the offender and not merely the crime" (Williams, 337 US at 247) and within "limits fixed by law" (id. at 246). 
A sentencing court may also consider, among other things, a defendant's "demeanor" (Grayson, 438 US at 50), "personality[]" (Williams, 337 US at 246), and criminal and social history (CPL 390.30 [1]), as well as the defendant's "attitudes toward society and prospects for rehabilitation" (Grayson, 438 US at 50), which may be revealed by their "truthfulness or mendacity while testifying on [their] own behalf" (id.). The tailoring of the punishment to the offender is accomplished in many instances with the assistance of a report prepared by "trained probation officers" following an "investigation of the defendant's life" (Grayson, 438 US at 48), "habits" (Williams, 337 US at 247), "background[]" (Williams, 337 US at 246), and reputation (see People v Williams, 219 AD3d 409, 409 [1st Dept 2023]). 

B.
Consistent with this court's directive, after defendant's remand to custody, the Erie County Probation Department prepared a presentence report and analysis relative to the penalty phase of this matter. The "evaluative analysis" of that report is consistent with the sense of this [*4]matter developed by this court throughout this proceeding and articulated in its most recent prior decision in this case (see Armeli, ___ Misc 3d at ___, 2025 NY Slip Op 25099). 
Immediately after rendering its verdict and before, among other things, receipt of the presentence report, the court was of the mind that a sentence limited to either community service or probation governed by only typical conditions might be an appropriate outcome. Defendant's repeated antagonism following his conviction, however, caused the court to question the feasibility and practicality of his participation in community service. 
The same actions caused this court to question the practicality and utility of a penalty limited to a period of probation and the general conditions normally attached thereto. In addition to the misconduct noted in its most recent prior decision in this matter (see id. at ___, **5-8), defendant consistently deflected responsibility for his actions, arguably misled the officer responsible for his release under supervision relative to the completion of an assessment recommended with respect to this matter, and failed to express remorse for the behavior of which he was convicted. The court notes that, although defendant may not be of perfect health, it has received no report that defendant has a condition that would defeat or even impair his ability to distinguish right from wrong. 
That misconduct, the court also notes, could easily transcend the confines of a police call center. Publicly available information reflects that call takers at the Erie County Central Police Services Communications Division process over 900,000 emergency and non-emergency calls each year (see 
https://www3.erie.gov/cps/enhanced-9-1-1 [accessed June 10, 2025]). Further publicly available information, culled from the blotter of a local newspaper, reflects that the department that was the target of defendant's misconduct regularly fields calls for emergency matters such as intoxicated drivers, missing persons, medical distress, burglaries in progress, unlawful imprisonment, house fires, water and land rescues, assaults, and violent domestic disturbances. Those and additional non-acute calls, to the court's further understanding, number in the thousands per year. Harassment of the nature in which defendant engaged threatens the ability of police and other emergency personnel to best and properly respond to those emergent and potentially life-threatening situations (cf. Penal Law § 195.05 [1]). 

C.
Courts have a different but still essential function in enhancing community safety. For example, this court frequently emphasizes a collaborative approach involving prosecutors, defense attorneys, law enforcement and, as appropriate, social workers and rehabilitation specialists to address root causes of crime and ultimately to reduce recidivism (see People v Hartman, 83 Misc 3d 1256[A] , at **5-6 nn 12-13 [Justice Court, Orchard Park 2025]).[FN2]
This court also engages in various forms of engagement typically involving younger members of the community designed to achieve the same goals. And, this court plays an important role in upholding public trust insofar as—acting in sorrow, but not in anger—it ensures that criminals are held responsible, that consequences reflecting an intolerance of crime are imposed, and that order and stability are maintained. 
In that role, courts cannot feel guilty about protecting the innocent. The crime of which defendant was convicted involves actions that threatened to distract emergency responders from [*5]doing their best to assist someone who, in simple and ineloquent terms, may have been at their worst. The type of behavior giving rise to defendant's conviction has not only failed to abate, but perhaps has been amplified since the incident giving rise to the subject charges.[FN3]

That pattern, in turn, has caused the court to question the efficacy of any penalty excluding both incarceration and a lengthy period of probation subject to specialized terms. And, to the extent both incarceration and future guardrails protecting from similar behavior are absent from any penalty imposed in this matter, the court wonders whether it would encourage the misconduct of which defendant was convicted and the threat posed to community safety that flows therefrom. 
In view of the constellation of circumstances—the nature of defendant's crime, his criminal history, his continued recalcitrance following his conviction, his failure to complete treatment services offered to him while at liberty, his lack of remorse, and the potential impact similar future misconduct may have on the community at large—this matter is one that demands a sentence designed to deter future misconduct of this nature and to protect the public from such activity for as long as allowed by law. To that end, this court now imposes what it believes to be the most significant penalty rendered relative to a matter of this nature and the maximum available restrictions on liberty available in the context of a split sentence. Specifically, this court sentences defendant to the maximum available period of sixty days' incarceration, to the maximum period of three years' probation, and imposes the maximum fine of $1,000.[FN4]
The court also imposes these specialized conditions of probation designed to prohibit similar future misconduct:
• Defendant shall have no non-emergency contact or communication with the Orchard Park Police Department, whether direct or indirect, or through proxy, through mediums including but not limited to telephone, social media, email, and/or video;
• Defendant shall have no non-emergency contact with Orchard Park Town Court staff, whether direct or indirect, or through proxy, through mediums including but not limited to telephone, social media, email, and/or video. Defendant may contact court staff for the purpose of seeking permission to enter the Orchard Park Municipal Center (located at 4295 South Buffalo Street, Orchard Park, New York 14127) for a nonemergency reason;
• Defendant shall not enter the Orchard Park Municipal Building, or be on its premises, for a non-emergency reason or purpose, absent prior permission of this court; and
• Defendant shall submit to warrantless search of person, property, residence, or vehicle upon request of the Probation Department to ensure, among other things, that the terms of and conditions of probation are not breached.[FN5]

III.
Accordingly, for the foregoing reasons, the court sentences defendant to a period of sixty days' incarceration, three years' probation (subject to general and special conditions outlined and agreed to by defendant at the sentencing hearing), and imposes the maximum fine of $1,000 together with a mandatory surcharge of $180, a crime victim assistance fee of $25, and a DNA databank fee of $50.[FN6]

Dated: June 12, 2025
Hon. Michael J. Pastrick

Footnotes

Footnote 1:The court also imposes the mandatory surcharge of $180, a crime victim assistance fee of $25, and a DNA databank fee of $50. Pursuant to Executive Law § 995-c (3), defendant also must provide a DNA sample for the state DNA identification index.

Footnote 2:The court notes that such options were afforded to, but declined by, defendant.

Footnote 3:That behavior, the court notes, stopped not upon conviction, but only upon messaging sent through incarceration.

Footnote 4:The court also imposes the mandatory surcharge of $180, a crime victim assistance fee of $25, and a DNA databank fee of $50. Pursuant to Executive Law § 995-c (3), defendant also must provide a DNA sample for the state DNA identification index.

Footnote 5:The court initially considered imposing a period of incarceration of up to one year (see Penal Law § 60.01 [3] [a]; § 70.15 [1]), which it notes would not have allowed for the inclusion of any period of probation in the sentence. Consistent with the People's recommendation, and in accordance with its own view as to the best means of balancing sentencing considerations including deterrence, retribution, and protection of public safety, the court opted for the longest restrictions available under the law, which consist of a split sentence of up to 60 days' incarceration and three years' probation (see § 60.01 [2] [d]; § 65.00 [3] [b] [i]). The court adds that, as indicated at the sentencing hearing, it remains willing to avail itself of any and all remedies available to it should defendant be found to have violated the terms of probation. 

Footnote 6:Pursuant to Executive Law § 995-c (3), defendant also must provide a DNA sample for the state DNA identification index.